Roland Charles EBERHARDT,
Plaintiff–Appellant,

v.

CITY OF LOS ANGELES, Los Angeles
Police Department, Defendants,

and

San Pedro Peninsula Hospital and Larry
Orosz, M.D., Defendants–Appellees.

No. 93–56564.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 7, 1995.

Decided Aug. 21, 1995.

Ernest J. Franceschi, Jr., Los Angeles, CA, for plaintiff-appellant.

Jo–Ann Horn Maynard, Rushfeldt, Shelley & Drake, Sherman Oaks, CA, for defendants-appellees, San Pedro Peninsula Hosp. and Larry Orosz, M.D.

Before: PREGERSON, POOLE, and D.W. NELSON, Circuit Judges.

PREGERSON, Circuit Judge:

Plaintiff–Appellant Roland Charles Eberhardt ("Eberhardt"), the father of decedent Allan Eberhardt, appeals the district court's grant of summary judgment in favor of Defendants–Appellees San Pedro Peninsula Hospital and Dr. Larry Orosz. Eberhardt sued the hospital and Dr. Orosz for discharging his son in an unstable mental condition, in violation of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (1986). Eberhardt's son was fatally shot by Los Angeles police officers 30 hours after he was discharged. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

## BACKGROUND

On July 18, 1991, neighbors of Allan Eberhardt called paramedics to report that Allan was suffering from a heroin overdose. Allan admitted to smoking heroin and taking cocaine. The paramedics found that Allan, who was 23 years old, was orientated, had a blood pressure of 130/96, a pulse of 64, respirations of 22, reactive pupils, and clear lungs. The paramedics applied oxygen and administered .8 mg. of Narcan, a drug that reverses the effects caused by morphine and other opioid drugs. The paramedics then transported Allan to San Pedro Peninsula Hospital.

At the hospital, Allan told the triage nurse that he had snorted cocaine and then smoked heroin. The nurse's notes indicate that Allan's chief complaint was a "heroin o.d.," and that he had a history of "psych and cocaine use." Initially, Allan refused treatment, but with coaxing, he agreed to let Dr. Larry Orosz, an emergency medicine physician, examine him.

Dr. Orosz found that Allan's blood pressure had dropped to 130/90, his respirations had dropped to 20, and his pulse remained at 64. Dr. Orosz concluded that the Narcan had improved Allan's condition. Initially lethargic, Allan was now alert and orientated. Dr. Orosz performed a physical examination and found that Allan was within normal parameters. Dr. Orosz did not order any labo-

ratory tests, nor did he conduct a psychiatric evaluation or a mental status evaluation.

Dr. Orosz diagnosed a heroin overdose and administered an additional 2 mg. of Narcan. Dr. Orosz then advised Allan to seek follow-up treatment at Harbor General Hospital for long-term methadone treatment. Allan signed a Patient Instruction Sheet, then pulled out his IV and walked out of the emergency room. Dr. Orosz testified in his deposition that right before Allan walked out, Allan told him that he was experiencing a feeling of "impending doom" and that Allan "was upset because we saved his life." Orosz Deposition at 24.

Thirty hours later, on July 20, 1990, Los Angeles police officers found Allan, who was armed with a machete, breaking the windows of a private residence. The police record indicates that when Allan charged at one of the officers with the machete, the officers shot him several times. The police record also indicates that he was "crazed out." One witness to the shooting testified that Allan shouted "kill me" and "put me out of my misery" before the police shot him. Allan was taken to San Pedro Peninsula Hospital, where he was pronounced dead. A toxicology report by the coroner shows that Allan had a blood alcohol level of .05. No drugs were detected in his system.

On July 1, 1992, Plaintiff–Appellant Roland Charles Eberhardt, Allan's father, filed a Second Amended Complaint for Damages for Allan's wrongful death. Eberhardt claimed that San Pedro Peninsula Hospital and Dr. Orosz violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd (1986), when they discharged Allan in an unstable mental condition.[1] The district court granted summary judgment in favor of Dr. Orosz because it concluded that the EMTALA does not allow a private right of action against the responsible physician, only the hospital. The district court also granted summary judgment in favor of the hospital because it concluded that the decedent's death was not the "direct result" of the hospital's alleged violation of the EMTALA.[2] Eberhardt now appeals.

## ANALYSIS

 A grant of summary judgment is reviewed de novo. *Jesinger v. Nevada Federal Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994). The panel must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

### A. Private Right of Action Against Physicians

In 1986, Congress enacted the Emergency Medical Treatment and Active Labor Act, commonly known as the "Patient Anti–Dumping Act," in response to a growing concern about "the provision of adequate emergency room medical services to individuals who seek care, particularly as to the indigent and uninsured." H.R.Rep. No. 241, 99th Cong., 1st Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 726–27. Congress was concerned that hospitals were "dumping" patients who were unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized.

42 U.S.C. § 1395dd(a) provides that if any individual comes to the emergency department of a hospital which participates in Medicare, and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital "must provide for an appropriate medical screening examination within the capability of the hospital's emergency department ...

---

1. Eberhardt also sued the Los Angeles Police Department and the officers who shot Allan for unconstitutionally discharging their weapons. The district court granted the city's motion for summary judgment on Eberhardt's claim that the city failed to train its officers, and denied the officers' motion for summary judgment on the issue of their individual liability for discharging their weapons. These summary judgment decisions are not the subject of the instant appeal.

2. The district court previously had ruled that triable issues of material fact existed as to whether the decedent was properly evaluated or stabilized at the time of his discharge. *See* ER 46.

to determine whether or not an emergency medical condition ... exists."

If the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395(b).

■ The question whether the EMTALA authorizes a private right of action against a physician is one of first impression in our circuit. The EMTALA on its face authorizes two types of enforcement, an administrative action for civil money penalties and a private right of action for civil damages. A participating hospital that negligently violates the EMTALA is subject to a civil money penalty of not more than $50,000. 42 U.S.C. § 1395dd(d)(1)(A). Any physician who is responsible for the examination, treatment, or transfer of an individual, who negligently violates the EMTALA, is also subject to a civil money penalty of not more than $50,000. 42 U.S.C. § 1395dd(d)(1)(B).

With respect to an aggrieved individual's private right of action, 42 U.S.C. § 1395dd(d)(2) provides:

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action *against the participating hospital,* obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

(Emphasis added.)

■ The plain text of the EMTALA explicitly limits a private right of action to the participating hospital. Perhaps the most widely accepted canon of statutory construction instructs us to first determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter, for the

court ... must give effect to the unambiguously expressed intent of Congress." *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

Notwithstanding the clear statutory language, Eberhardt urges us to find an *implied* private right of action against physicians. He argues that under the standard articulated in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), such a cause of action would enable individuals to enforce the EMTALA more effectively. Eberhardt's argument fails.

In *Cort,* the Supreme Court set forth the four-part test for determining whether a private remedy is implicit in a statute not expressly providing one: (1) Does the statute create a federal right in favor of the plaintiff? (2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? (3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? (4) Is the cause of action one traditionally relegated to state law? *Id.* at 78, 95 S.Ct. at 2087–88.

Consistent with the statutory language, the legislative history of the EMTALA evinces a clear Congressional intent to bar individuals from pursuing civil actions against physicians. An earlier draft of § 1395dd(d)(2), the provision which provides for a private right of action, "did not precisely identify which parties could bring actions under the provision, nor did it identify those against whom they could bring such an action." H.R.Rep. No. 241, 99th Cong., 1st Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 728. The House Judiciary Committee then amended the provision to its present form to "clarif[y] that actions for damages may be brought only against the hospital which has violated the requirements of [the EMTALA]." *Id.*

Our holding today is consistent with every appellate court that has decided whether the EMTALA allows a private right of action against physicians. *See King v. Ahrens,* 16 F.3d 265, 271 (8th Cir.1994); *Delaney v. Cade,* 986 F.2d 387, 393–93 (10th Cir.1993);

*Baber v. Hospital Corp. of America,* 977 F.2d 872, 877 (4th Cir.1992); *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1040 n. 1 (D.C.Cir.1991).

The only case that has adopted a contrary view misconstrued the EMTALA's legislative history. In *Sorrells v. Babcock,* 733 F.Supp. 1189, 1193 (N.D.Ill.1990), the district court held that an individual may maintain a private cause of action against a physician. The court relied on a statement made by the House Judiciary Committee explaining why it rejected a provision which authorized criminal sanctions:

> The criminal sanction is unnecessary because the other sanctions ... will serve to deter violations of the standards of [the EMTALA], ... and these sanctions may be imposed against both hospitals and doctors.

*Id.* (citing 1986 U.S.C.C.A.N. 729). However, any implication of an intent to authorize a private right of action against physicians is quickly dispelled by reading the next sentence, in which the Committee described these "other sanctions":

> Subsection (d)(1) authorizes stripping a hospital of its medicare certification.... Subsection (d)(2) authorizes the imposition upon a hospital or doctor of a civil penalty.... Finally, subsection (d)(3) authorizes an aggrieved party to sue a hospital, in federal or state court, for damages and other suitable relief.

1986 U.S.C.C.A.N. 729. Thus, read in context, the statement upon which the *Sorrells* court relied shows that the Committee clearly meant that the other sanctions, *taken as a whole,* may be imposed against both hospitals and doctors, but that a private right of action may be maintained only against hospitals.

Accordingly, we affirm the district court's ruling that the EMTALA does not allow private suits against physicians.

## B. Violation of the EMTALA

Eberhardt claims that the hospital's failure to place a 72–hour protective hold on his son violated the EMTALA because the hospital should have known that his son was suicidal. The district court concluded that triable issues of fact remain as to whether the hospital properly evaluated or stabilized the decedent, but that the hospital was still entitled to summary judgment because any alleged violation of the EMTALA was not the "legal cause" of nor a "substantial factor" in bringing about the decedent's death. District Court's Order at 4–6.

■ We conclude that the district court did not need to reach the causation issue because Eberhardt failed to proffer any evidence to show that the hospital violated the requirements of the EMTALA.

42 U.S.C. § 1395dd(a) requires a hospital emergency department to provide for an "appropriate medical screening examination" to determine whether an "emergency" medical condition exists. Eberhardt argues that the hospital did not provide his son with an appropriate medical screening examination because it failed to detect his suicidal tendency. We disagree.

The text of § 1395dd(a) does not define the term "appropriate medical screening examination," other than to state that its purpose is to identify an "emergency medical condition." 42 U.S.C. § 1395dd(e)(1)(A) defines an "emergency medical condition" as:

> a medical condition manifesting itself by *acute* symptoms of sufficient *severity* (including severe pain) such that the absence of *immediate* medical attention could reasonably be expected to result in—(i) placing the health of the individual ... in serious jeopardy; (ii) serious impairment to bodily functions; or (iii) serious dysfunction of any bodily organ or part.

(Emphasis added.)

■ Thus, the plain language of the EMTALA informs us that a medical screening examination is "appropriate" if it is designed to identify *acute* and *severe* symptoms that alert the physician of the need for *immediate* medical attention to prevent serious bodily injury. The EMTALA does not require physicians to detect medical conditions that are *not* manifested by acute and severe symptoms, nor those that do not require immediate medical attention to prevent serious bodily injury.

Eberhardt has failed to proffer sufficient evidence to show that his son's suicidal tendency was manifested by "acute" or "severe" symptoms, or that the condition required immediate medical attention. The decedent's acute symptoms were that of a drug overdose, which Dr. Orosz diagnosed through a physical examination and then stabilized with an additional dosage of Narcan.

In hindsight, the decedent's medical record, which indicated that he had a history of "psych," and the decedent's anger at Dr. Orosz for having treated him may have suggested a self-destructive disposition. But the decedent erased any misgivings Dr. Orosz could have had by signing the Patient Instruction Sheet, in which he agreed to seek follow-up care at a methadone treatment center. Moreover, the decedent's fatal encounter with the police officers did not occur until 30 hours after the hospital discharged him, suggesting that the decedent's alleged suicidal condition arose well after he had been discharged, and thus, that he did not require "immediate" treatment for the condition while he was at the hospital.

■ The hospital's failure to detect the decedent's alleged suicidal tendency may be actionable under state medical malpractice law, but not under the EMTALA. The statutory language of the EMTALA clearly declines to impose on hospitals a national standard of care in screening patients. The applicable provisions only require that the screening be "within the capability of the hospital's emergency department," including "routinely available" ancillary services. 42 U.S.C. § 1395dd(a). As 42 U.S.C. § 1395dd(f) makes clear, the EMTALA does not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with the requirements of the EMTALA.

■ Consistent with the statutory language, the legislative history shows that Congress enacted the EMTALA not to improve the overall standard of medical care, but to ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay. See H.R.Rep. No. 241, 99th Cong., 1st Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 726–27.

Other circuits that have assessed the appropriateness of a screening examination have all held that the test is whether the challenged procedure was identical to that provided similarly situated patients, as opposed to whether the procedure was adequate as judged by the medical profession. *See Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 272 (6th Cir.1990) (EMTALA precludes resort to a malpractice or other objective standard of care as to the meaning of the term "appropriate"); *Gatewood*, 933 F.2d at 1041 (same); *Baber*, 977 F.2d at 879–80 (same).

■ Of course, Congress's refusal to impose a national standard of care does not mean that a hospital can discharge its duty under the EMTALA by not providing *any* screening, or by providing screening at such a minimal level that it properly cannot be said that the screening is "appropriate." *See Baber*, 977 F.2d at 879 n. 7 (contemplating that a hospital's standard may be so low "that it amount[s] to *no* 'appropriate medical screening'"). The touchstone is whether, as § 1395dd(a) dictates, the procedure is designed to identify an "emergency medical condition," that is manifested by "acute" and "severe" symptoms.

Eberhardt does not allege, nor is there any evidence to show that the screening provided to his son was not comparable to that provided to other patients who manifested similar symptoms, or that his son's alleged suicidal condition was manifested by acute or severe symptoms that the hospital ignored. Accordingly, we hold that the hospital did not fail to provide the decedent an "appropriate medical screening examination."

Eberhardt also contends that the hospital violated the EMTALA by failing to "stabilize" his son's alleged suicidal tendency. 42 U.S.C. § 1395dd(b) provides that "if any individual ... comes to a hospital, and the hospital determines that the individual has an emergency medical condition, the hospital must provide ... such treatment as may be necessary to stabilize the medical condition," or transfer the patient to another medical facility.

As the text of the statute clearly states, the hospital's duty to stabilize the patient does not arise until the hospital first detects an emergency medical condition. Thus, because the hospital here did not detect the decedent's alleged suicidal tendency, it had no obligation to stabilize this unapparent medical condition.[3] *See Baber*, 977 F.2d at 883 (rejecting contention that hospital is liable for failing to stabilize conditions of which it should have known); *Gatewood*, 933 F.2d at 1041 (stabilization and transfer provisions "are triggered only after a hospital determines that an individual has an emergency medical condition"); *Cleland*, 917 F.2d at 271 n. 2 (hospital cannot be charged with duty to stabilize condition that was not ascertained, even though an appropriate screening was provided) (citations omitted).

## CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Dr. Orosz because the EMTALA does not authorize a private right of action against physicians, and we affirm the district court's grant of summary judgment in favor of the hospital because Eberhardt has not produced sufficient evidence to show that the hospital violated the requirements of the EMTALA.

AFFIRMED.

---

3. Accordingly, we need not decide whether the 72–hour protective hold was necessary. However, we do note that the stabilization requirement is not met by simply dispensing uniform stabilizing treatment, but rather, by providing the treatment necessary "to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result...." 42 U.S.C. § 1395dd(e)(3)(A). *See also, In the Matter of Baby K*, 16 F.3d 590, 596 (4th Cir.1994) ("[T]he Hospital must provide that treatment necessary to prevent the material deterioration of each patient's emergency medical condition."), *cert. denied*, —— U.S. ——, 115 S.Ct. 91, 130 L.Ed.2d 42 (1994).