Stanley KILCUP, et al.   Plaintiff,

v.

ADVENTIST HEALTH, INC., et al., Defendants.

No. C 97–1207 JL.

United States District Court, N.D. California.

July 23, 1999.

Richard J. Massa, Richard J. Massa & Associates, Lakeport, CA, for Stanley Kill-cup.

John S. Gilmore, Goldsberry, Freeman & Swanson, LLP, San Francisco, CA, for Adventist Health Inc.

Thomas J. Donnelly, Sonja K. Dahl, Anderson, Galloway & Lucchese, San Francisco, CA, for Redbud Community Hospital District.

Robert Lynch and Matthew F. Miller, Lynch, Loofbourrow, Gilardi & Grummer, San Francisco, CA, for JJ&R Emergency Management Group, Inc. and Jose Sanchez, M.D.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' EMTALA CLAIMS; DENYING PLAINTIFFS' COUNTER MOTIONS

LARSON, United States Magistrate Judge.

### INTRODUCTION

Defendants Redbud Community Hospital District ("Redbud") and Adventist Health Care ("Adventist") filed motions for summary judgment as to Plaintiffs' claims under 42 U.S.C. § 1395dd et seq., the Emergency Medical Treatment and Active Labor Act, ("EMTALA"). Plaintiffs filed a Counter Motion for partial summary judgment against Redbud and Adventist, as well as Janzen, Johnston & Rockwell ("JJ & R"), and Dr. Jose Sanchez.[1] This Court had previously heard the motions of all Defendants for summary judgment on Plaintiffs' claims under California medical malpractice law and had issued a tentative ruling granting those motions as to all Defendants. This Court informed Redbud and Adventist, however, that it would not grant summary judgment for Defendants on Plaintiffs' causes of action under the federal EMTALA statute, since the issues were separate and distinct from the issues in the claims related to alleged medical malpractice. A hearing was held on the Defendants' motions and Plaintiffs' counter-motions on April 14, 1999. Appearing

---

1. This Court considered Plaintiffs' counter-motion regarding their EMTALA claims against Redbud and Adventist. The court did not consider Plaintiffs' motion respecting malpractice claims, on which the court has already ruled, or the motion regarding EMTALA claims against JJ & R and Dr. Sanchez, as these parties have no potential liability under EMTALA.

for Plaintiffs was Richard J. Massa. Appearing for Redbud Community Hospital District was Sonja K. Dahl. Appearing for Adventist was John S. Gilmore.

## SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

In a motion for summary judgment, "[i]f the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103–04 (9th Cir.), cert. denied, 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986).

A moving party who will not have the burden of proof at trial need only point to the insufficiency of the other side's evidence, thereby shifting to the nonmoving party the burden of raising genuine issues of fact by substantial evidence. *T.W. Electric*, 809 F.2d at 630, citing *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Kaiser Cement*, 793 F.2d at 1103–04.

When the moving party goes beyond the deficiencies of the evidence on an issue for which the nonmoving party will have the burden of proof, and produces evidence which negates an essential element, "the burden shifts to the nonmoving party to produce evidence sufficient to support a

jury verdict in her favor." *Gasaway v. Northwestern Mut. Life Ins. Co.*, 26 F.3d 957, 959 (9th Cir.1994), quoting *Hopkins v. Andaya*, 958 F.2d 881, 884 (9th Cir.1992).

Once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, any inferences from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Id.* at 587, 106 S.Ct. 1348. See Fed.R.Civ.P. 56(e). The opposing party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996). The opposing party must bring forth facts, which are not only admissible under general rules of evidence, but also sufficient for a jury to return a favorable verdict for the opposing party. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. If the opposing party fails to contradict the moving party with such evidence, the moving party's evidence may be taken as the truth, and a court may properly dismiss the claims. *Id.*

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party. *T.W. Electric*, 809 F.2d at 630–31, citing *Matsushita*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538; *Ting v. U.S.*, 927 F.2d 1504, 1509 (9th Cir.1991).

## CAUSATION

Defendants contend that, if this Court has previously found that their actions did not cause Mr. Kilcup's death, then the court's finding of no causation means they are also relieved of liability under EMTALA. This is an incorrect interpretation of the burden of proof and the path of the

analysis in a cause of action brought under EMTALA.

█ The death of Mr. Kilcup is not the only injury which plaintiffs allege. They also assert claims for their own emotional distress at their father's death. If a violation of EMTALA caused or was a substantial factor in causing such an injury, even though not in causing Mr. Kilcup's death, the other plaintiffs, his family members, could potentially have a valid claim under EMTALA.

Summary judgment may be granted to defendants, where plaintiffs have been unable to demonstrate a violation of EMTALA, which was the legal cause or a substantial factor in plaintiff's death. Absent a showing of a violation of EMTALA, the court need not even reach the issue of causation. The Ninth Circuit has held as follows:

> The district court concluded that triable issues of fact remain as to whether the hospital properly evaluated or stabilized the decedent, but that the hospital was still entitled to summary judgment because any alleged violation of the EMTALA was not the "legal cause" of nor a "substantial factor" in bringing about the decedent's death. District Court's Order at 4–6.

> We conclude that the district court did not need to reach the causation issue because Eberhardt failed to proffer any evidence to show that the hospital violated the requirements of the EMTALA statute.

> *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1257 (1995)

The distinction between causation as applied to medical malpractice and causation as applied to EMTALA may be explained thus:

> The EMTALA civil enforcement provision does not state that the alleged injury must directly cause death. Rather, 42 U.S.C. § 1395dd(d)(2)(A) states that "any individual who suffers personal harm as a direct result of ... [a violation of EMTALA] ... may ... obtain those damages available for personal injury under the law of the State in which the hospital is located ..." 42 U.S.C. § 1395dd(d)(2)(A). Count II of the Amended Complaint alleges that the decedent directly suffered a lost chance or recovery or survival because of DePaul's violation of EMTALA. As such, in Count II plaintiff seeks to recover those damages expressly provided for under EMTALA.

*Baucom v. DePaul Health Center*, 918 F.Supp. 288, 292–293 (E.D.Mo.1996).

## Negligence Not Necessary

In a case heard by Chief Judge Patel of this District, involving Redbud Hospital, and where these Plaintiffs' counsel also represented the plaintiff, the court held that "a plaintiff need not prove negligence in order to prevail on an EMTALA claim." *Jackson v. East Bay Hosp.*, 980 F.Supp. 1341, 1348 (N.D.Cal.1997).

In that case, Plaintiff claimed that a combination of psychiatric medications given to her husband in a hospital emergency room caused heart arrhythmia and sudden death.

*Id.* at 1343–44.

The court held that:

> It is well-established that EMTALA does not create a federal remedy for medical negligence, nor does it duplicate state-law medical malpractice claims; rather, EMTALA creates a separate cause of action which makes hospitals strictly liable for refusing "essential emergency care because of a patient's inability to pay." Furthermore, EMTALA claims do not rest on any proof that the hospital was negligent or that the hospital failed to make a correct diagnosis or provide adequate treatment. EMTALA and state medical malpractice laws are not synonymous causes of ac-

tion; they provide "distinct remedies for distinct wrongs."

*Id.* (citations omitted).

Consequently, this Court must first determine whether Defendants have violated any of the provisions of EMTALA, and then proceed to analyze whether any violation of EMTALA was a legal cause or a substantial factor in the death of plaintiff Stanley Kilcup or in any subsequent injury to plaintiffs John and William Kilcup and Pamela Dunham, Mr. Kilcup's children.

## PURPOSE OF EMTALA

Congress enacted EMTALA, commonly known as the Patient Anti–Dumping Act, in response to concerns that hospitals were transferring or refusing to treat patients who were unable to pay.[2] *James v. Sunrise Hosp.*, 86 F.3d 885, 887 (9th Cir.1996). To address these concerns, EMTALA requires hospitals to take certain steps whenever an individual requests emergency medical treatment.

### Medical Screening and Certification

First, the hospital must provide an appropriate medical screening examination. 42 U.S.C. § 1395dd(a).

Thereafter, if the hospital determines that the individual has an emergency medical condition, the hospital must either attempt to stabilize the condition or transfer the individual to another facility. 42 U.S.C. § 1395dd(b)(1).

On April 6, 1996, Stanley Kilcup was brought to the Emergency Room at Redbud Community Hospital by his daughter, Pamela Dunham. He had been staying for a day or two at her home so she could drive him to his chemotherapy appointment at David Grant Medical Center, where he was being treated for a recurrence of lung cancer. She was concerned

that morning because he was feverish, not eating, and so sleepy she could not awaken him. (Deposition of Pamela Dunham, Ex. C to Declaration of Sonja Dahl, pp. 67:27—70:12, 71:3—74:17).

He was examined by Dr. Jose Sanchez, the Emergency Room physician on duty at Redbud when he was brought in. Dr. Sanchez determined that, as a side effect of his chemotherapy, Mr. Kilcup had virtually no white blood cells (a condition called neutropenia) and few platelets (thrombocytopenia). (Redbud Hospital Medical Record, Ex. H to Dahl Declaration in Support of Defendants' Summary Judgment Motion). His metabolism was out of balance. His potassium level was low, causing his heart to flutter. (Ex. I to Dahl Declaration, Deposition of Jose Sanchez, M.D. at p. 47:9–13). His ravaged body was defenseless against bacteria which surround and live within every normal person. His blood had become infected with E.Coli, probably from his own intestines, manifested by fever when he arrived, and confirmed by blood tests (Redbud Hospital Medical Record, Ex. A to Declaration of Matthew Miller in support of Defendants' Motion for Summary Judgment on Malpractice Claims; Deposition of Jose Sanchez, M.D. p. 73:1–7). His fever could also have been caused by neutropenia (Declaration of Dr. Gandara in Support of Defendants' Motions for Summary Judgment on Malpractice).

■ Defendants' expert, Dr. Raffin, testified that Mr. Kilcup received appropriate screening and the correct conclusion that he suffered from an emergency medical condition. Plaintiff has offered no evidence to the contrary. Therefore, this Court finds that Dr. Sanchez had conducted a thorough evaluation of Mr. Kilcup and

---

**2.** At one time, a line of cases focused on the disparate treatment element of EMTALA, the concern of Congress that patients were being treated differently, based on their ability to pay. This placed a burden on plaintiffs to show hospitals' motive for transfer or failure to treat. The Supreme Court recently ruled

that a plaintiff need not show improper motive for a transfer in order to prevail on a claim under EMTALA. The plaintiff merely must prove that the patient was not properly stabilized before the transfer. *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999).

ordered appropriate tests sufficient to satisfy the medical screening requirement of EMTALA.

### Duty to Stabilize Patient's Condition

Before transferring a patient, the treating hospital has a duty to stabilize the patient's medical condition, i.e., "To provide such medical treatment of the condition as may be necessary to assure, within reasonable probability, that no material deterioration of the condition is likely to result from or occur during the transfer." (42 U.S.C. § 1395dd(e)(3)(A)).

Dr. Sanchez treated Mr. Kilcup with powerful antibiotics such as Primaxin, as well as Neupogen, a high-tech drug to rebuild white blood cells, along with potassium supplements and intravenous fluids. (See Redbud Memorandum in Support of Defendants' Motion for Summary Judgment on Malpractice at page 8 for summary of treatment). After a night at Redbud, Mr. Kilcup got better. His fever went down, his potassium level normalized and he took in a significant amount of fluid and was producing urine. His BUN was still abnormal, but Dr. Sanchez interpreted this to be a result of infection, rather than dehydration. (Deposition of Jose Sanchez, M.D., Ex. I to Dahl Declaration, in Support of Motion for Summary Judgment—Malpractice, page 72:4–18).

█ According to Defendants' expert, Dr. Raffin, Mr. Kilcup was admitted overnight at Redbud Community Hospital, and received appropriate care and treatment that temporarily stabilized his medical condition. Mr. Kilcup was then properly transferred with stable vital signs over a period of hours and via an appropriate mechanism to another facility. Again, Plaintiff has failed to present any evidence to the contrary. Therefore, this Court finds no arguable violation of Defendants' duty to stabilize the Plaintiff.

### Certification of Risks and Benefits of Transfer of Unstable Patient

Sometimes it is impossible for a hospital fully to stabilize a patient, but, in the judgment of the treating physician, the patient must nevertheless be transferred in order to obtain care not available at the transferring hospital. A hospital may not, however, transfer an individual in an unstable condition unless a physician ... "has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual ... from effecting the transfer ..."

42 U.S.C. § 1395dd(c)(1). *Vargas by and Through Gallardo v. Del Puerto Hosp.*, 98 F.3d 1202, 1204 (9th Cir.1996).

In the *Vargas* case, an Emergency Room physician transferred an 18–month–old girl who was having seizures, even though her condition was unstable, because she needed pediatric intensive care which was not available at his hospital. The district court held, and the appellate court affirmed, that transfer, even of an unstable patient, was justified, if the transferring physician weighed the risks and benefits of the transfer. *Vargas*, 98 F.3d 1202, 1203.

Even if the certification is not in writing, a physician may satisfy the requirement by convincing evidence that the evaluation was made. The court of appeals affirmed the district court decision in *Vargas* that EMTALA liability did not rest on a technical deficiency in the risk-benefit certification. The court held that the hospital could remedy failure to summarize in writing the specific risks of transfer by establishing that the risk/benefit assessment was in fact performed:

> A hospital was not liable under Emergency Medical Treatment and Active Labor Act (EMTALA) despite technical deficiency of doctor's failure to include written summary of specific risks of transfer on transfer certificate, as doctor actually weighed risks and benefits of

transfer, failure to write down risks was not direct cause of patient's harm, patient received appropriate medical screening exam, and doctor certified that benefits outweighed risks and summarized benefits. Social Security Act, § 1867(c)(1), as amended, 42 U.S.C.A. § 1395dd(c)(1).

*Vargas,* 98 F.3d 1202.

An important part of the certification requirement is whether the risks and benefits of the transfer are explained to the patient or the patient's family. A hospital may not transfer such a patient unless "the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations ... and the risks of transfer, in writing requests transfer to another medical facility," and the physician has signed a certification that "based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual ..." and the transfer is "an appropriate transfer" to that facility. (42 U.S.C. § 1395dd(c)(1)).

Dr. Sanchez testified at deposition that he discussed the risks and benefits of the proposed transfer of Mr. Kilcup from Redbud Community Hospital to David Grant Hospital with Mr. Kilcup's daughter, Pamela Dunham, because he thought Mr. Kilcup was too ill to understand the "pros and cons." (Deposition of Jose Sanchez, M.D. at p. 50:13–20, pp. 66 et seq., Ex. I to Declaration of Sonja Dahl in support of Defendants' Summary Judgment Motion— Malpractice). There is also a copy in the medical record of an Informed Consent Form, signed by Mr. Kilcup himself. (Ex. A to Declaration of Matthew Miller in Support of Defendants' Summary Judg-

ment Motion). Dr. Sanchez told John Kilcup that he thought his father was stable. (Deposition of John Kilcup 46:13–15, Ex. D to Declaration of Sonja Dahl).

The plan to transfer Mr. Kilcup to David Grant Hospital at Travis Air Force Base was at the request of Pamela Dunham, according to Dr. Sanchez. (Deposition of Jose Sanchez, M.D. at p. 49:16—p. 50:25). Neither Dr. Sanchez nor Ms. Dunham remembers who brought up the transfer first. (Deposition of Pamela Dunham, Ex. C to Dahl Declaration, at page 65). The contemporaneous medical record says the transfer was initiated by "patient request." (Redbud Hospital Medical Record, Ex. H to Declaration of Sonja Dahl). In this same medical record the nurse's notes say "[patient] signed transfer papers ..." (A signed informed consent document is at Ex. A to Declaration of Matthew Miller). A medical record at Travis says "Patient apparently insisted on transfer." (Medical Record of David Grant Medical Center, Ex. E to Declaration of Matthew Miller). Mr. Kilcup had an appointment for chemotherapy treatment at David Grant Medical Center for the following Monday, so it would have been reasonable to send him there, if he was already scheduled to be seen. His daughter had been planning to drive her father to his chemotherapy appointment. (Deposition of Pamela Dunham at p. 72:16–19).

■ Accordingly, this Court finds that both the screening and certification requirements of EMTALA were met. Again, Plaintiff has not presented evidence to the contrary.

### Care During Transfer

Plaintiffs' experts do not offer any persuasive criticism of the care rendered during the transfer.[3] Defendants' experts of-

---

3. Dr. Edelman is critical of the decision to transfer, partially on the basis of Mr. Kilcup's hypokalemia and presumed dehydration as shown by his failure to produce adequate urine. This opinion appears to be based on

an inaccurate reading of the medical record. The urine output Dr. Edelman presumes is much less than what the medical record shows. *See also* Deposition of Jose Sanchez, M.D. p. 71:22–28, Ex. I to Declaration of

fer specific opinions that the transfer was appropriate and that the care Mr. Kilcup received during the transfer in no way contributed to his death:

> Declaration of Dr. Meharg: "There is no additional care that could have been rendered by the Redwood Empire Life Support paramedic or EMT who handled the transfer of Mr. Kilcup that would have changed the outcome for Mr. Kilcup that day."

> "The appropriateness of Dr. Sanchez's interventions and medications is evidenced by Mr. Kilcup's vital signs for the approximate 2.5 hour period prior to transfer and the continued stability of these vital signs en route to David Grant Medical Center, as contained in the records of Redwood Empire Life Support."

(Declaration of John Meharg, M.D. Ex. To Motion for Summary Judgment–Malpractice of Redwood Empire Life Support).

> Declaration of Dr. Homonchuk:

> "It is further my opinion that transfer of Mr. Kilcup to David Grant medical Center was appropriate and within the standard of care."

(Ex. B. to Declaration of Matthew Miller in Support of Motion for Summary Judgment–Malpractice of JJ & R and Sanchez)

> Declaration of Dr. Raffin:

> "Mr. Kilcup was properly transferred with stable vital signs over a period of hours, and via an appropriate mechanism; Mr. Kilcup decompensated at some point after discharge from Redbud Community Hospital, most probably suffering cardiac arrhythmia that lead to cardiac arrest and death, coincidental with his arrival at David Grant Hospital; and had Mr. Kilcup decompensated in the Intensive Care Unit at Stanford University Medical Center and received all of the resuscitative efforts that facility has to offer, it is more probable than not that he would have expired nonetheless, and the transfer therefore played

absolutely no causative role in Mr. Kilcup's death."

(Attachment to Declaration of Sonja Dahl in Support of Motion for Summary Judgment—Malpractice).

### Plaintiffs' Cause of Action Under EMTALA: Personal Harm

42 U.S.C. § 1395dd(d)(2)(A) states that "any individual who suffers personal harm as a direct result of ... [a violation of EMTALA] ... may ... obtain those damages available for personal injury under the law of the State in which the hospital is located...." 42 U.S.C. § 1395dd(d)(2)(A). *See Baucom,* 918 F.Supp. 288, 292–293.

In the case at bar, Plaintiffs, John and William Kilcup and Pamela Dunham, Stanley Kilcup's adult children, allege that they suffered personal harm as a result of Defendants' violations of EMTALA. This claim could have survived, even though the court previously granted Defendants' motions for summary judgment on the California medical malpractice claim. However, Plaintiffs have the burden of proving a violation of EMTALA which resulted in injury to them. This they have failed to do. The evidence is uncontroverted that Defendants provided a proper medical screening examination of Mr. Kilcup, stabilized his condition, weighed the risks and benefits of the transfer from Redbud Community Hospital to David Grant Medical Center, and thereafter provided proper care during the transfer.

### CONCLUSION

Defendants breached no duty of care owed to Mr. Kilcup under state law, and therefore this Court has granted their motions for summary judgment as to Plaintiffs' causes of action for negligence, emotional distress and wrongful death. However, Plaintiffs need not prove negligence in order to prevail on a claim under EMTALA. Plaintiffs do however have the burden of proving a violation of the

requirements for medical screening, stabilization, and certification in order to establish a threshold violation of EMTALA upon which they could base their claims of injury.

Plaintiffs presented no evidence that Defendants either failed to perform an adequate medical screening examination or transferred an unstable patient without considering the risks and benefits of the transfer. Mr. Kilcup was stable, or as stable as he was ever going to be, given his declining condition. Furthermore, his treating physicians, the ones most knowledgeable about his condition, were at David Grant Medical Center, where, according to his daughter, he had an appointment for treatment the same day he was transferred. Accordingly, Defendants have not violated either the letter or the spirit of EMTALA.

### Judicial Notice

This Court takes judicial notice of the decision of March 17, 1999 of the District Court (Hon. Susan Ilston) in the Case of *Burrows v. Redbud*, C–96–4345 SI. Judge Ilston found that liability under EMTALA is strictly limited to hospitals, and that, given the nature of the relationship between Adventist and Redbud created by the Association Agreement, Redbud was the hospital for the purpose of EMTALA liability, and that no vicarious liability could be imposed on Adventist. The events at issue in the *Burrows* case took place less than two months prior to the events at issue in the case at bar, and therefore this court finds the court's decision in the *Burrows* case persuasive that no liability of Redbud could be attributed to Adventist. Since this court finds no liability on the part of Redbud, Adventist is also relieved of liability.

Summary judgment is granted for Defendants on Plaintiffs' claims under EMTALA. Plaintiffs' counter-motions are denied.

This order and the court's prior order on the state law claims, for negligence, inflic-tion of emotional distress, and wrongful death, have disposed of all Plaintiffs' claims in this case. Accordingly, judgment shall be entered for Defendants. Parties to bear their own costs.