Sandra BRYANT, Successor–in–Interest to David Howard Bryant, deceased; David Wayne Bryant, Heir and Surviving Parent of David Wayne Bryant, deceased; Tom Worthy; Michael Bryant, Plaintiffs–Appellants,

v.

ADVENTIST HEALTH SYSTEM/WEST; Redbud Community Hospital District; Wolfgang Schug, M.D.; Robert Rosenthal; Andrew J. Dorfman; Richard Furtado, M.D.; J.J. & R. Management Group, Inc.; Adventist–Redbud Hospital, Inc.; Michael H. Schultz; Mark Freeman, M.D.; Redbud Community Healthcare District, Defendants–Appellees.

No. 00–16399.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 2001.

Filed May 20, 2002.

Richard J. Massa, Massa & Associates, Lakeport, CA, for the plaintiffs-appellants.

Sonja M. Dahl, Anderson, Galloway & Lucchese, Walnut Creek, CA; John S. Gilmore, Goldsberry, Freeman & Swanson, Sacramento, CA; David A. Heck, Bradley, Curley, Asiano & McCarthy, PC, San Francisco, CA, for the defendants-appellees.

Before: CANBY, GRABER, and PAEZ, Circuit Judges.

PAEZ, Circuit Judge.

Plaintiffs, the heirs of minor decedent David Bryant ("David"), brought this wrongful death action against Redbud Community Hospital ("Redbud") for damages and injunctive relief for, among other things, violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, commonly known as the "Patient Anti–Dumping Act." Plaintiffs alleged that when David sought care from Redbud's emergency room, the emergency room staff failed to detect his emergency medical condition and then discharged him without stabilizing his condition, in violation of EMTALA's stabilization requirement. Plaintiffs further alleged that after David returned to the emergency room the next day and was admitted to the hospital for inpatient care, Redbud again violated EMTALA's stabilization requirement by failing to stabilize his condition during the three days after it admitted him for treatment.

The district court granted Redbud's motion for summary judgment on the EMTALA claims, and it declined to exercise supplemental jurisdiction over related state-law claims. The district court ruled that Redbud could not be liable under EMTALA merely because its medical staff failed to detect an emergency medical condition.

The district court also ruled that once Redbud admitted David for inpatient care, Plaintiffs' remedies for David's alleged inadequate medical care were under state law, not EMTALA. We agree with the district court and, therefore, affirm.

## I. Factual and Procedural History

David was a 17-year-old boy who was severely disabled and had the mental capacity of a young child. He was unable to communicate with anyone other than close relatives. He had a history of asthma, bronchitis, and pneumonia. On the evening of January 24, 1997, David, accompanied by his mother and other family members, went to Redbud's emergency room because he had been coughing up blood and had a fever. After examining David, a nurse classified his condition as "urgent."

Soon thereafter, Dr. Robert Rosenthal examined David. David's mother told Dr. Rosenthal that her son had suffered from a fever for approximately four days and appeared to be experiencing pain in the right side of his chest. Dr. Rosenthal noticed that David was coughing up yellow phlegm, had a mild fever, and was wheezing. Dr. Rosenthal ordered a chest x-ray and blood tests. He failed to detect on the x-ray a large lung abscess, which Defendants concede constituted an emergency medical condition, and diagnosed David with only pneumonia and asthma. Dr. Rosenthal then treated David with Albuterol, which assists breathing, and prescribed an antibiotic, Rocephrin, for the pneumonia. Because David was agitated, the medical staff was not able to inject the full dosage of Rocephrin. Nonetheless, the medical staff determined that it had injected a sufficient amount of the antibiotic to stabilize his pneumonia. Because David's condition appeared stable and because Dr. Rosenthal and David's family agreed that

David would be more relaxed at home, Dr. Rosenthal discharged him. Dr. Rosenthal, however, requested that the family return with David the following day for further diagnosis and treatment. David and his family left the hospital at approximately 2:30 a.m. on January 25.

In the afternoon of January 25, as David and his family were preparing to leave for the hospital, a hospital employee called and told them to return immediately because Dr. Richard Furtado had determined from David's chest x-ray that he had a lung abscess. Dr. Furtado considered the abscess to be a "problem worthy of admission." Shortly after David's arrival at the emergency room, Dr. Furtado admitted David to the hospital, and he was transferred from the emergency room to a medical/surgical room.

By January 28, David's condition had declined rapidly, and the doctor responsible for his care decided to transfer him to the Intensive Care Unit. Because there were no beds available in the Intensive Care Unit, David was transferred to U.C. Davis Medical Center, where he eventually had surgery. Plaintiffs do not contend that this emergency transfer to the Center was improper or a violation of EMTALA. On February 20, David was released from U.C. Davis and returned home. Although David appeared to be improving, he died suddenly and unexpectedly on March 1, 1997.

Plaintiffs filed this action in district court against Redbud Community Healthcare District; Adventist Health System/West, Inc.; Janzen, Johnston & Rockwell Emergency Medical Group of California; and several of the treating physicians. The amended complaint alleged violations of EMTALA, violation of a similar state law (California Health & Safety Code § 1317), and negligence.[1]

---

1. Redbud Community Healthcare District and Adventist Health System/West, Inc. (collec- tively, "Defendants") are the only defendants against which the federal claims are alleged.

Defendants moved for summary judgment. They argued that Redbud's medical staff was not required under EMTALA to stabilize David's lung abscess before discharging him on January 25, 1997, because the medical staff had not yet detected the abscess. Defendants also maintained that once Redbud admitted David for treatment later that day, EMTALA no longer applied.

The district court agreed with Defendants and granted summary judgment on the EMTALA claims. After dismissing the federal claims, the court exercised its discretion to dismiss the supplemental state-law claims without prejudice.

## II. Standard of Review

 We review de novo a district court's grant of summary judgment. *Botosan v. Paul McNally Realty*, 216 F.3d 827, 830 (9th Cir.2000). We review a district court's dismissal of supplemental state-law claims for an abuse of discretion. *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 478 (9th Cir.1998).

## III. Discussion

### A. EMTALA

 Congress enacted EMTALA to ensure that individuals, regardless of their ability to pay, receive adequate emergency medical care. *Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1254 (9th Cir.2001). "Congress was concerned that hospitals were 'dumping' patients who were unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized." *Eberhardt v. City of Los Angeles*,

62 F.3d 1253, 1255 (9th Cir.1995). EMTALA protects all individuals, not just those who are uninsured or indigent. *Arrington v. Wong*, 237 F.3d 1066, 1069–70 (9th Cir. 2001).

If an individual seeks emergency care from a hospital with an emergency room and if that hospital participates in the Medicare program, then "the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department ... to determine whether or not an emergency medical condition ... exists." [2] 42 U.S.C. § 1395dd(a); *Eberhardt*, 62 F.3d at 1255–56. If the hospital's medical staff determines that there is an emergency medical condition, then, except under certain circumstances not relevant here, the staff must "stabilize" the patient before transferring or discharging the patient. 42 U.S.C. § 1395dd(b)(1); *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 992 (9th Cir. 2001). The term "to stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" 42 U.S.C. § 1395dd(e)(3)(A). Transfer includes both discharge and movement to another facility. *Id.* § 1395dd(e)(4).

### B. The January 24–25 Emergency Room Visit

Plaintiffs concede that Redbud's staff performed an appropriate medical screening on January 24 but argue that the hospital violated EMTALA by failing to

**2.** An "emergency medical condition" is defined in pertinent part as:

[A] medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(i) placing the health of the individual ... in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part[.]

42 U.S.C. § 1395dd(e)(1)(A).

stabilize David's lung abscess condition. Plaintiffs contend that § 1395dd(b)(1) should be read to include a reasonableness standard in determining whether a hospital has detected an emergency medical condition. Thus, Plaintiffs argue, in effect, that a hospital should be liable under EMTALA if its staff negligently fails to detect an emergency medical condition.

 EMTALA, however, was not enacted to establish a federal medical malpractice cause of action nor to establish a national standard of care. *Baker*, 260 F.3d at 993; *see also, e.g., Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1137 (8th Cir.1996) (en banc) ("So far as we can tell, every court that has considered EMTALA has disclaimed any notion that it creates a general federal cause of action for medical malpractice in emergency rooms."); *Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir.1994) ("Section 1395dd(a) is not designed to redress a negligent diagnosis by the hospital; no federal malpractice claims are created."). Thus, we have held that a hospital has a duty to stabilize only those emergency medical conditions that its staff detects. *Jackson*, 246 F.3d at 1254–55 (" 'As the text of [EMTALA] clearly states, the hospital's duty to stabilize the patient does not arise until the hospital first detects an emergency medical condition.' " (quoting *Eberhardt*, 62 F.3d at 1259)); *see also Baker*, 260 F.3d at 994 ("Since [the physician] never detected a medical emergency, [the hospital] had no duty under EMTALA to stabilize Baker before discharging him."). Every circuit to address this issue is in accord. *Marshall ex rel. Marshall v.*

*E. Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 324–25 (5th Cir.1998); *Summers*, 91 F.3d at 1140; *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir. 1996); *Urban ex rel. Urban v. King*, 43 F.3d 523, 525–26 (10th Cir.1994); *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C.Cir.1991); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 271 & n. 2 (6th Cir.1990). To restate our ruling in *Jackson*, we hold that a hospital does not violate EMTALA if it fails to detect or if it misdiagnoses an emergency condition. *Baker*, 260 F.3d at 993–94.[3] An individual who receives substandard medical care may pursue medical malpractice remedies under state law. *Eberhardt*, 62 F.3d at 1258.

 Here, it is undisputed that Dr. Rosenthal did not detect David's lung abscess before he discharged David in the early morning of January 25. It was not until later that day, when Dr. Furtado reviewed the x-ray, that the hospital detected David's emergency medical condition. It was at that time, when David returned to the emergency room, that the hospital had a duty to stabilize his lung abscess condition. Plaintiffs' expert opined that Dr. Rosenthal should have known that David likely had a lung abscess or should have consulted another doctor regarding the x-ray before discharging him. Although the expert's opinion may be relevant to a malpractice claim under state law, it is not relevant to the EMTALA claim.

Plaintiffs contend that, even if Defendants are not liable for their failure to detect the lung abscess, there is still a

---

**3.** Our prior cases address Plaintiffs' concern that a hospital will intentionally fail to diagnose an emergency medical condition in order to avoid EMTALA's stabilization requirement. We have held that a hospital may be found liable under EMTALA's screening provision if the screening examination "is so cursory that it is not 'designed to identify

acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury.' " *Jackson*, 246 F.3d at 1256 (quoting *Eberhardt*, 62 F.3d at 1257). Plaintiffs here do not allege an intentional failure to diagnose an emergency medical condition.

triable issue of fact whether the hospital staff stabilized David's pneumonia with Rocephrin before he was discharged on January 25, because an unknown amount of the antibiotic was injected. Assuming that David's pneumonia qualified as an emergency medical condition, it is undisputed that Redbud's medical staff determined that a sufficient amount of Rocephrin had been injected. Plaintiffs' conclusory statement that there is a genuine issue of material fact, without evidentiary support, is insufficient to withstand summary judgment. *See Tarin v. County of Los Angeles*, 123 F.3d 1259, 1265 (9th Cir.1997) ("Because Tarin points to nothing in the record, other than her own conclusory statements, to refute the County's explanations for its decisions, we affirm the district court's grant of summary judgment to defendants with respect to Tarin's claims of unlawful retaliation."). Accordingly, we affirm the district court's ruling that the hospital did not violate EMTALA's stabilization requirement when it discharged David in the early morning of January 25.

## C. The January 25–28 Hospitalization

To determine whether Defendants may be liable under EMTALA during David's three-day hospitalization at Redbud, we must decide when EMTALA's stabilization requirement ends. We hold that the stabilization requirement normally ends when a patient is admitted for inpatient care.

When David and his family returned to the emergency room in the afternoon of January 25, the hospital staff knew that David suffered from an emergency medical condition. EMTALA's stabilization provision requires a hospital, when confronted with an "emergency medical condition," to provide "(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility in accordance with [the statute]." 42 U.S.C. § 1395dd(b)(1). Although the term "stabilize" appears to reach a patient's care after the patient is admitted to a hospital for treatment, the term is defined only in connection with the transfer[4] of an emergency room patient. *Id.* § 1395dd(e)(3)(A) ("The term 'to stabilize' means ... to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely *to result from or occur during the transfer* of the individual from a facility ...." (emphasis added)). Thus, the term "stabilize" was not intended to apply to those individuals who are admitted to a hospital for inpatient care. As the Fourth Circuit explained in *Bryan v. Rectors & Visitors of the University of Virginia:*

> The stabilization requirement is ... defined entirely in connection with a possible transfer and without any reference to the patient's long-term care within the system. It seems manifest to us that the stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that treatment. It cannot plausibly be interpreted to regulate medical and ethical decisions outside that narrow context.

95 F.3d 349, 352 (4th Cir.1996); *see id.* at 352–53 (holding that the complaint failed to state a claim under EMTALA when the patient was treated for twelve days and then, pursuant to a hospital policy, the

---

4. As noted above, the term "transfer" includes discharge. 42 U.S.C. § 1395dd(e)(4).

medical staff entered a "do not resusci-tate" order and the patient died).

In contrast to the Fourth Circuit, the Sixth Circuit has suggested that it would not so limit EMTALA's stabilization re-quirement, stating in dictum that a viola-tion of EMTALA can occur even after a patient has been hospitalized for a number of days. *Thornton v. Southwest Detroit Hosp.,* 895 F.2d 1131, 1135 (6th Cir.1990). After suffering a stroke, the patient in *Thornton* sought care at a hospital's emer-gency room and was subsequently admit-ted to the hospital. The patient spent ten days in the Intensive Care Unit and eleven days in inpatient care. The patient's doc-tor wanted a rehabilitation facility to admit the patient for post-stroke rehabilitation, but the facility refused because the pa-tient's health insurance would not cover the cost. The patient was discharged from the hospital and her condition deteriorat-ed.

The Sixth Circuit explained that, "once a patient is found to suffer from an emer-gency medical condition in the emergency room, she cannot be discharged until the condition is stabilized, regardless of wheth-er the patient stays in the emergency room." *Id.* at 1134. The court held that, in the case before it, the hospital had stabilized the patient's condition and, thus, the defendant was not liable under EMTA-LA. *Id.* at 1135. The court stressed, however, that its conclusion was not based on the fact that the patient had been in the hospital for a "prolonged period" but on the fact that there was no genuine issue of material fact whether her condition was stable when she was released. *Id.* It rea-soned:

Although emergency care often occurs, and almost invariably begins, in an emergency room, emergency care does not always stop when a patient is wheeled from the emergency room into the main hospital. Hospitals may not circumvent the requirements of [EMTA-LA] merely by admitting an emergency room patient to the hospital, then imme-diately discharging that patient. Emer-gency care must be given until the pa-tient's emergency medical condition is stabilized.

*Id.* Thus, the Sixth Circuit explained that a violation of EMTALA could be established even after a patient is transferred from the emergency room and admitted into the hospital for treatment.[5]

 Although we recognize the con-cerns raised by the Sixth Circuit, we agree with the Fourth Circuit's approach in de-termining when EMTALA's stabilization requirement ends. We hold that EMTA-LA's stabilization requirement ends when an individual is admitted for inpatient care. Congress enacted EMTALA "to create a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat" and not to "duplicate

---

5. Addressing a different issue—whether EM-TALA applies to patients who do not first seek treatment in the emergency room, but instead obtain care from another hospital depart-ment—the First Circuit agreed with the Sixth Circuit that EMTALA reaches beyond the emergency room into the main hospital. *Lo-pez–Soto v. Hawayek,* 175 F.3d 170, 173–77 (1st Cir.1999). However, the First Circuit recognized the problem with the "temporal limitation" on a hospital's obligation under EMTALA by noting:

> Requiring hospital-wide stabilization of individuals with emergency medical con-

ditions raises the question of how long subsection (b)'s stabilization obligations persist. If stabilization were mandated by EMTALA without limit of time, it might well encroach upon the province of state malpractice law. Withal, other courts have found ways to cabin such un-due expansions of EMTALA into the mal-practice realm.

*Id.* at 177 n. 4. The court then cited the Fourth Circuit's decision in *Bryan* as an ex-ample of a case that set a "temporal limita-tion" on a hospital's obligation under EMTA-LA. *Id.*

preexisting legal protections." *Gatewood*, 933 F.2d at 1041; *see also Hardy v. N.Y. City Health & Hosps. Corp.*, 164 F.3d 789, 792–93 (2d Cir.1999) ("EMTALA was enacted to fill a lacuna in traditional state tort law by imposing on hospitals a legal duty (that the common law did not recognize) to provide emergency care to all."); *Brooks v. Md. Gen. Hosp., Inc.*, 996 F.2d 708, 710 (4th Cir.1993). After an individual is admitted for inpatient care, state tort law provides a remedy for negligent care. If EMTALA liability extended to inpatient care, EMTALA would be "convert[ed] ... into a federal malpractice statute, something it was never intended to be." *Hussain v. Kaiser Found. Health Plan*, 914 F.Supp. 1331, 1335 (E.D.Va.1996).

■ Our opinion in *James v. Sunrise Hospital*, 86 F.3d 885 (9th Cir.1996), supports the EMTALA limitation that we recognize today. In *James*, we held that EMTALA's transfer provision, which generally prohibits the transfer of a patient with an emergency medical condition that has not been stabilized, 42 U.S.C. § 1395dd(c), applies only to individuals who "come[ ] to the emergency room," not to individuals who are directly admitted to the hospital. *James*, 86 F.3d at 889. If we were to follow the Sixth Circuit's reasoning in *Thornton*, then, because of *James*, there would be an anomalous result—patients who were first treated in the emergency room and were then transferred to other hospital departments or discharged would be protected by EMTALA's stabilization provision but patients who bypassed the emergency room would not be entitled to those same protections.

We agree with the Sixth Circuit that a hospital cannot escape liability under EMTALA by ostensibly "admitting" a patient, with no intention of treating the patient, and then discharging or transferring the patient without having met the stabilization requirement. In general, however, a hospital admits a patient to provide inpatient care. We will not assume that hospitals use the admission process as a subterfuge to circumvent the stabilization requirement of EMTALA. If a patient demonstrates in a particular case that inpatient admission was a ruse to avoid EMTALA's requirements, then liability under EMTALA may attach. But this is not such a case.

Here, Redbud assumed care of David when Dr. Furtado admitted him to the hospital on January 25. Once Redbud admitted David for inpatient care, EMTALA no longer applied. Accordingly, the district court properly granted summary judgment on this claim.[6]

**D. Dismissal of the Supplemental State–Law Claims**

Because the district court did not err in granting summary judgment on the federal claims, it did not abuse its discretion in dismissing the state-law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a [state-law] claim ... if ... the district court has dismissed all claims over which it has original jurisdiction."); *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of the factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

**IV. Conclusion**

Congress passed EMTALA to address the failure of hospitals to provide emer-

---

**6.** Because we conclude that there was no liability under EMTALA once David was admitted for inpatient care, we need not reach the issue of causation.

gency medical care to the uninsured and indigent. Congress did not intend for EMTALA to be a federal malpractice statute. Accordingly, a hospital cannot be held liable under EMTALA if it negligently fails to detect or if it misdiagnoses an emergency medical condition. Additionally, EMTALA generally ceases to apply once a hospital admits an individual for inpatient care, just as it ceased to apply here.

Because the district court did not err in granting summary judgment in favor of Defendants on Plaintiffs' EMTALA claims, it did not abuse its discretion in dismissing the supplemental state-law claims.

AFFIRMED.