246 F.3d 1248 (9th Cir. 2001)
 BARBARA JACKSON, SUCCESSOR-IN- INTEREST, SURVIVING WIFE AND HEIR OF ROBERT JACKSON, DECEASED; SANDRA JACKSON, A MINOR, BY THROUGH HER GUARDIAN AD LITEM, MELINDA DALE PLAINTIFFS-APPELLANTS,
v.
EAST BAY HOSPITAL; REDBUD COMMUNITY HOSPITAL DISTRICT; MIGUEL M. OLLANDA; SPENCER STEELE; ADVENTIST HEALTH, INC. DEFENDANTS-APPELLEES.
 No. 98-17152
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted December 13, 2000
Filed April 19, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 James M. Braden (argued), San Francisco, California, for the plaintiffs-appellants.
 Mitchell C. Tilner (argued), Mary F. Dant, Encino, California, Thomas J. Donnelly, Sonja M. Dahl, Walnut Creek, California, for defendant-appellee Redbud Community Hospital District.
 John S. Gilmore (argued), Sacramento, California, for defendant-appellee Adventist Health, Inc.
 Appeal from the United States District Court for the Northern District of California Marilyn H. Patel, District Judge, Presiding D.C. No. CV-96-03276-MHP
 Before: David R. Thompson, Diarmuid F. O'Scannlain, and A. Wallace Tashima, Circuit Judges.
 
 
 1
 Opinion by Judge O'Scannlain; Partial Concurrence and Partial Dissent by Judge Tashima
 
 O'Scannlain, Circuit Judge
 
 2
 We must decide, among other questions, whether a hospital violates the Emergency Medical Treatment and Active Labor Act ("EMTALA") if it fails to diagnose the cause of a patient's emergency condition, but treats the symptoms identified, and concludes that the patient has been stabilized.
 
 I.
 
 3
 This appeal arises out of Robert Jackson ("Jackson")'s visits to the Redbud Community Hospital ("Redbud") emergency room on April 2, 4, and 5, 1996, in Clearlake, California. Redbud entered into an "Association Agreement Regarding the Affiliation of Redbud Health Care District with Adventist Health Systems/West" (the "Association Agreement") which became effective on July 5, 1995. This agreement stated that the parties anticipated a future affiliation, and that Adventist Health Systems/West ("Adventist") would provide Redbud with administrative and financial services. On July 1, 1997, Adventist and Redbud entered into an"Agreement for Purchase and Sale of Assets" (the "Purchase Agreement"). Adventist currently operates Redbud.
 
 
 4
 On April 2, 1996, Jackson visited the Lake County Mental Health Department ("Lake County") to see a psychiatrist. Jackson previously had been diagnosed with psychotic disorder, borderline intellectual functioning, and pedophilia. The Lake County staff instructed Jackson to go to the Redbud emergency room to receive a medical clearance before returning to Lake County. At Redbud, a nurse took Jackson's medical history, vital signs, current medications and drug allergies. Half an hour later, Dr. Wolfgang Schug, a Redbud emergency room doctor, examined Jackson and ordered blood tests. Dr. Schug noted that Jackson was reporting hallucination, dizziness, and unsteadiness, and that he was taking Anafranil and Ativan.[1] Dr. Schug then diagnosed Jackson as suffering from acute psychosis; neither he, nor any other Redbud physician or employee, diagnosed Jackson as suffering from an emergency medical (as opposed to a psychological or psychiatric) condition.
 
 
 5
 Redbud did not offer psychiatric care to its patients, and the unwritten policy of the Redbud emergency room was that when a patient presented to the emergency room with psychiatric complaints, the patient would be examined to determine if there were any medical components to his problem. If a medical problem was found, it would take precedence over the psychiatric complaints. If no medical problem was found, the patient would be referred to a psychiatrist or to a mental health facility for an appropriate psychiatric follow-up. Dr. Schug arranged for Lake County (which provides psychiatric care) to see Jackson upon his release, where he was evaluated by Dennis Skinner, a Lake County employee.
 
 
 6
 On April 4, 1996, Jackson returned to the Redbud emergency room. A triage nurse took Jackson's medical history, vital signs, and current medications. An hour later, Dr. Miguel Ollada, a Redbud emergency room doctor, took a separate medical history and evaluated Jackson, who complained of a sore throat, chest pain while breathing, and dry heaves. Dr. Ollada also observed Jackson talking to himself. Dr. Ollada performed a complete physical exam, and ordered a battery of tests including an electrocardiogram, a urine screening, and a blood gas test. The urine analysis indicated the presence of a tricyclic antidepressant, such as the Anafranil Jackson was known to be taking. Dr. Ollada diagnosed Jackson as having chest contusions, hypertension, and pyschosis, but not drug toxicity. Dr. Ollada gave Jackson medications, and ordered a mental health consultation, to be conducted at Lake County. Lake County refused to evaluate Jackson, however, because he had been recently seen by its staff, who found him to be non-suicidal. Believing Jackson to be non-suicidal, and his condition to have stabilized, Dr. Ollada released Jackson from Redbud, and he instructed Jackson to return to Lake County the next morning.
 
 
 7
 At 3:45 a.m. on April 5, 1996, Jackson returned to the Redbud emergency room after his wife found him wandering in the road in the middle of the night. A nurse performed an initial medical evaluation, and Dr. Ollada performed another examination at 3:50 a.m. Dr. Ollada observed that Jackson was very agitated, but he also observed that Jackson had a regular heartbeat, and that he presented no other physical symptoms. Barbara Jackson told Dr. Ollada that she believed that her husband was suicidal, because she found him in the middle of the road, waving his hands. Dr. Ollada determined that Jackson was suffering from a psychological disorder which caused his agitation, but that he was not suffering from any physical disorders. Dr. Ollada prescribed and administered Haldol and Benadryl in an effort to sedate Jackson and to stabilize his condition.[2] Dr. Ollada ordered that Lake County be contacted regarding Jackson's condition.
 
 
 8
 Later in the morning of April 5, Susan Smith, a Lake County crisis worker, evaluated Jackson. Smith found that Jackson's condition met the criteria for involuntary psychiatric commitment, and she concluded that he suffered from a pyschological disorder, anxiety, and a dependent personality. Smith then asked Dr. Ollada to clear Jackson for a transfer to East Bay Hospital ("East Bay"), which functioned almost exclusively as a psychiatric hospital. Dr. Ollada found that Jackson's condition had stabilized (he was no longer agitated, and was sleeping), that he was not suffering from a life- threatening condition, and that a transfer to East Bay Hospital did not pose a risk to Jackson's condition.
 
 
 9
 At 9:15 a.m., Redbud transferred Jackson to East Bay, where he was seen by Dr. Spencer Steele, a psychiatrist who performed a psychiatric, but not a physical, examination of Jackson. At the time of the transfer, Dr. Ollada believed that Jackson's condition had been stabilized. Dr. Steele prescribed more Haldol for Jackson. Shortly before 2:00 p.m., the East Bay medical staff concluded that Jackson was so unable to control his own movements that he posed a danger to himself and others. At 2:00 p.m., Jackson went into cardiac arrest. East Bay staff began to perform CPR, and they ordered an ambulance to transfer Jackson to Brookside Hospital ("Brookside"). Jackson arrived at Brookside's emergency room at approximately 2:30 p.m. Jackson received emergency care at Brookside, but he was pronounced dead at 2:37 p.m. An autopsy determined that Jackson died from sudden cardiac arrhythmia, caused by acute psychotic delirium, which was in turn caused by clomipramine (Anafranil) toxicity. None of the doctors or nurses who saw Jackson at Redbud diagnosed him as suffering from Anafranil (or other drug) toxicity.
 
 
 10
 Barbara Jackson and Sandra Jackson, Jackson's wife and daughter ("Jackson's survivors" or "the survivors") filed suit against the physicians who treated Jackson, East Bay Hospital, Redbud, and Adventist in the Northern District of California. Their complaint asserted claims under EMTALA, California Health and Safety Code § 1317, and California state tort law.
 
 
 11
 In a May 15, 1998, order, the district court granted summary judgment to Redbud and Adventist on Jackson's survivors' EMTALA and § 1317 claims. The district court also held, as a matter of law, that the agreement between Redbud and Adventist did not make Adventist liable to Jackson as Redbud's joint tortfeasor or joint venturer. In an October 8, 1998, order, the district court declined to retain supplemental jurisdiction over the remaining state law claims. The district court dismissed those claims pursuant to 28 U.S.C. § 1367(c)(3), and it tolled the statute of limitations for these claims to permit Jackson's survivors to file a new action in state court. They re-filed in state court, where their case is still pending.[3] The district court entered judgment dismissing Jackson's survivors' complaint in its entirety, and they filed this timely appeal.
 
 II.
 
 12
 Congress enacted EMTALA, commonly known as the "Patient Anti-Dumping Act," in response to the growing concern about the provision of adequate medical services to individuals, particularly the indigent and the uninsured, who seek care from hospital emergency rooms. Congress was concerned that hospitals were dumping patients who were unable to pay for care, either by refusing to provide emergency treatment to these patients, or by transferring the patients to other hospitals before the patients' conditions stabilized. See H.R. Rep. No. 241, 99th Cong., 1st Sess., Part I, at 27 (1985), reprinted in 1986 U.S. Code Cong. & Admin. News 579, 605 ("The Committee is greatly concerned about the increasing number of reports that hospital emergency rooms are refusing to treat patients with emergency conditions if the patient does not have medical insurance.").
 
 
 13
 EMTALA imposes a series of obligations on a hospital emergency department. First, the hospital must provide an "appropriate medical screening examination within the capability of the hospital's emergency department." 42 U.S.C. § 1395dd(a) (1986). This examination must determine "whether or not an emergency medical condition... exists." Id. An "emergency medical condition" is one "manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in -- (i) the placing of the health of the individual... in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part..." 42 U.S.C. § 1395dd(1)(A). If the hospital detects an emergency medical condition, the hospital must provide "either (A) within the staff and facilities available at the hospital, for such medical examination and such treatment as may be required to stabilize the medical condition, or (B) for the transfer of the individual to another medical facility...." 42 U.S.C. § 1395dd(b)(1). "If an individual at a hospital has an emergency medical condition which has not been stabilized... the hospital may not transfer the individual unless... a physician has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual...." 42 U.S.C. § 1395dd(c)(1). "As the text of the statute clearly states, the hospital's duty to stabilize the patient does not arise until the hospital first detects an emergency medical condition." Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1259 (9th Cir. 1995). Similarly, the transfer restrictions "apply only when an individual `comes to the emergency room,' and after `an appropriate medical screening examination,' the hospital determines that the individual has an emergency medical condition.' " James v. Sunrise Hosp., 86 F.3d 885, 889 (9th Cir. 1996).
 
 A.
 
 14
 Jackson's survivors argue that Redbud violated EMTALA's screening requirements by providing medically inadequate screening examinations and by failing to order additional tests on April 5, when, they allege, it was obvious that Jackson was suffering from a physical disorder, and not a psychological one.[4] The survivors also argue that the examinations performed by Redbud's doctors and nurses were so wanting as to be "inappropriate" medical screening examinations. Acknowledging the weight of authority supporting the district court's conclusion that an examination does not have to be "medically adequate" to satisfy EMTALA's requirements, they ask us to overrule those precedents. In addition, they argue, without evidentiary support, that there is a material possibility that the doctors acted in bad faith because their diagnoses were "inherently implausible." We reject all of these arguments, and hold that Redbud satisfied its EMTALA screening obligations.
 
 
 15
 "The statutory language of the EMTALA clearly declines to impose on hospitals a national standard of care in screening patients." Eberhardt, 62 F.3d at 1258. Instead, the "touchstone is whether, as § 1395dd dictates, the procedure is designed to identify an `emergency medical condition,' that is manifested by `acute' and `severe' symptoms. " Id. Seven of our sister circuits have held that to comply with this requirement, a hospital only must provide a screening examination that is comparable to that offered to other patients with similar symptoms. See Correa v. Hosp. San Francisco, 69 F.3d 1184, 1192-93 (1st Cir. 1995) ("[F]aulty screening, in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute."); Baber v. Hosp. Corp. of Am., 977 F.2d 872, 879 (4th Cir. 1992) ("[W]hile EMTALA requires a hospital emergency department to apply its standard screening examination uniformly, it does not guarantee that the emergency personnel will correctly diagnose a patient's condition as a result of this screening."); Marshall v. E. Carroll Parish Hosp. Serv., 134 F.3d 319, 323-24 (5th Cir. 1998) ("[A] treating physician's failure to appreciate the extent of the patient's injury or illness... may constitute negligence or malpractice, but cannot support an EMTALA claim for inappropriate screening.... It is the plaintiff's burden to show that the Hospital treated her differently from other patients"); Cleland v. Bronson Health Care Group, Inc., 917 F.2d 266, 272 (6th Cir. 1990) ("If [the hospital] acts in the same manner as it would have for the usual paying patient, then the screening provided is `appropriate' within the meaning of the statute."); Summers v. Baptist Med. Ctr. Arkadelphia, 91 F.3d 1132, 1139 (8th Cir. 1996) (en banc) ("[W]e hold that instances of `dumping' or improper screening of patients for a discriminatory reason, or failure to screen at all, or screening a patient differently from other patients perceived to have the same condition, all are actionable under EMTALA. But instances of negligence in the screening or diagnostic process, or of mere faulty screening, are not."); Holcomb v. Monahan, 30 F.3d 116, 117 (11th Cir. 1994) ("As long as a hospital applies the same screening procedures to indigent patients which it applies to paying patients, the hospital does not violate this section of the Act."); Gatewood v. Wash. Healthcare Corp., 932 F.2d 1037, 1041 (D.C. Cir. 1991) ("[A] hospital fulfills the `appropriate medical screening' requirement when it conforms in its treatment of a particular patient to its standard screening procedures.").
 
 
 16
 In Eberhardt, we did not explicitly adopt this comparative test as the standard for compliance with § 1395dd(a), but we did cite Baber, Cleland, and Gatewood, and we noted that the appellants in that case did not allege that the challenged screening differed from the examination provided to comparable patients. 62 F.3d at 1258. We now adopt this comparative test. We hold that a hospital satisfies EMTALA's"appropriate medical screening" requirement if it provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, unless the examination is so cursory that it is not "designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury." Eberhardt, 62 F.3d at 1257. This standard is consistent with Congress's purpose in enacting EMTALA, which was to limit the ability of hospitals to avoid treating poor or uninsured patients. See 1986 U.S.C.C.A.N. at 605.
 
 
 17
 The district court concluded that there was no genuine issue of material fact that Jackson received initial screening examinations which satisfied Redbud's EMTALA obligations. The court noted that the Redbud doctors and nurses performed these screenings according to Redbud guidelines, and that Jackson was triaged by a nurse and examined by a doctor during each of his visits to the Redbud emergency room. During these visits, the physicians performed several physical examinations and ordered multiple laboratory tests. The district court also concluded that Jackson's survivors failed to create a genuine issue of material fact that these examinations were so substandard or of such low quality as to violate EMTALA, and that the Jackson's survivors' expert witnesses established nothing more than a failure to properly diagnose Jackson's symptoms, an error which might result in state tort liability, but not in EMTALA liability. The district court also rejected as groundless the argument that Jackson was treated differently from other patients because he exhibited psychiatric, and not just physical, symptoms. It also rejected the argument that the Redbud physicians departed from their own procedures when they consulted with a Lake County crisis worker.
 
 
 18
 The district court properly concluded that Redbud complied with EMTALA's screening requirements. Jackson's survivors' own expert witnesses testified that they had no reasons to believe that Jackson was treated differently than other patients presenting similar symptoms to the Redbud emergency department. Nor did the survivors present evidence to support the conclusion that the screening examinations were so lacking as to support a conclusion that the examinations were not "designed to identify acute and severe symptoms."
 
 B.
 
 19
 Jackson's survivors also argue that Redbud failed to stabilize Jackson's emergency medical condition prior to his transfer to East Bay, in violation of 42 U.S.C.§ 1395dd(b)(1). As we have previously explained, a "hospital's duty to stabilize the patient does not arise until the hospital first detects an emergency medical condition." Eberhardt, 62 F.3d at 1259. In Eberhardt, the plaintiff claimed that the hospital violated EMTALA's stabilization requirements by failing to treat his son's suicidal tendency, and that this failure led to his son's death. We rejected this argument, and held that the hospital had no obligation to stabilize the son's suicidal tendency, because the hospital never detected it. Id. This "actual detection" rule comports with the law of five other circuits, which requires a showing of actual knowledge of the emergency medical condition by the hospital as a condition precedent to the stabilization requirement. See Summers, 1140 F.3d at 1140 (8th Cir.) ("[U]nder the express wording of the statute, this portion of EMTALA applies only if `the hospital determines that the individual has an emergency medical condition...' Here, the hospital believed [the patient ] was suffering from muscle spasms, not an emergency medical condition. The duty to stabilize therefore never arose.") (citing Vickers v. Nash Gen. Hosp., Inc., 78 F.3d 139, 140 (4th Cir. 1996); Urban v. King, 43 F.3d 523, 525-26 (10th Cir. 1994); Cleland, 917 F.2d at 268-69 (6th Cir.)); Gatewood, 933 F.2d at 1041 (D.C. Cir.) ("Here, no such [emergency ] condition was diagnosed, and the statute's stabilization and transfer requirements are therefore inapplicable."). This standard also applies to EMTALA claims brought in California state courts. See Barris v. County of Los Angeles, 972 P.2d 966, 972 (Cal. 1999) ("[T]he elements of a civil claim for failure to stabilize include the following: (1) the hospital had actual knowledge that a patient was suffering from an `emergency medical condition'...").
 
 
 20
 The district court rejected the contention that Redbud failed to stabilize Jackson's condition. Instead, it found that the expert witnesses agreed that Redbud stabilized the only emergency condition its doctors detected: agitation which posed a risk of Jackson injuring himself. The district court noted that these experts concluded that Jackson's physical symptoms, which consisted of altered vital signs, increased respiratory rate, hypertension, and chest contusions, did not, by themselves, constitute a medical emergency. The district court also rejected the argument that Redbud had an obligation to stabilize Jackson's Anafranil toxicity, concluding that Redbud did not have to stabilize this condition, which was not diagnosed as the cause of Jackson's symptoms.
 
 
 21
 The parties agree that Dr. Ollada believed that he had stabilized Jackson's condition at the time of his transfer to East Bay, and that he believed that Jackson was no longer agitated at that time. The parties' disagreement concerns medical conditions which remained undetected by the Redbud medical staff. Redbud's failure to diagnose the true cause of Jackson's symptoms cannot serve as the basis for a violation of EMTALA's stabilization requirements. Eberhardt, 62 F.3d at 1259. The district court properly concluded that there was no genuine issue of material fact that Redbud stabilized the only emergency condition it detected, and the court correctly held that Redbud did not violate EMTALA's stabilization requirements.
 
 C.
 
 22
 The survivors also contend that Redbud violated EMTALA's certification requirements because Dr. Ollada did not "sign[ ] a certification... that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment outweigh the risks to the individual." 42 U.S.C. § 1395dd(c)(1)(A)(ii). Such a certification" shall include a summary of the risks and benefits upon which the certification is based." 42 U.S.C. § 1395dd(c)(1). The survivors argue that the certification form signed by Dr. Ollada was deficient because the form did not contain specific written descriptions of each of those risks and benefits. We conclude, however, that EMTALA's certification requirement does not apply in the circumstances of this case. The certification provision applies only when a hospital has detected an emergency medical condition and thereafter elects to transfer the patient, rather than to stabilize the condition. See 42 U.S.C. §§ 1395dd(b)(1), 1395dd(c). The obvious purpose of this provision is to require the treating physician to certify that the expected benefit from the transfer outweighs the risk of transfer when a detected emergency medical condition has not been stabilized. In this case, as we have noted above, Redbud stabilized the only emergency medical condition that it detected. As far as Redbud knew, Jackson did not have a detected but unstabilized emergency medical condition. The certification requirement does not apply under the facts of this case.
 
 III.
 
 23
 California Heath and Safety Code § 1317 is"California's version of 42 U.S.C. § 1395dd." Brooker v. Desert Hospital Corp., 947 F.2d 412, 415 (9th Cir. 1991). It imposes on California hospitals an obligation to tend to all patients requesting emergency care:
 
 
 24
 Emergency services and care shall be provided to any person requesting the services or care, or for whom services or care is requested, for any condition in which the person is in danger of loss of life, or serious injury or illness, at any health facility licensed under this chapter that maintains and operates an emergency department to provide emergency services to the public when the facility has appropriate facilities and qualified personnel available to provide the services or care.
 
 
 25
 Cal. Health & Safety Code § 1317(a) (West 2000). The statute defines "emergency services and care" as "medical screening, examination, and evaluation by a physician... to determine if an emergency medical condition or active labor exists and, if it does, the care, treatment, and surgery by a physician necessary to relieve or eliminate the emergency medical condition, within the capability of the facility." Cal. Health & Safety Code § 1317.1(a)(1).
 
 
 26
 Section 1317 also provides a safe harbor for hospitals and doctors who refuse to render care, provided that their refusal is based on a determination that the person is not suffering from an emergency condition or that they cannot treat the emergency condition afflicting the patient:
 
 
 27
 Neither the health facility, its employees, nor any physician and surgeon... shall be liable in any action arising out of a refusal to render emergency services or care if the refusal is based on the determination, exercising reasonable care, that the person is not suffering from an emergency condition, or that the health facility does not have the appropriate facilities or qualified personnel available to render those services.
 
 
 28
 Cal. Health & Safety Code § 1317(c).
 
 
 29
 The district court granted Redbud summary judgment on the § 1317 claim for the same reasons it granted it summary judgment on the EMTALA claim. The district court found that the Redbud doctors provided medical screenings, examinations, and evaluations designed to determine whether Jackson had an emergency condition, and the court found that Redbud provided the care and treatment required to eliminate the emergency condition Dr. Ollada identified (Jackson's agitation). The district court also noted that § 1317(a) precludes liability for the failure to provide a particular service if the hospital does not have the appropriate facilities and personnel to provide that service. The district court concluded that this provision made Redbud not liable for its transfer of Jackson to East Bay, because the Redbud physicians determined that Jackson had a psychological condition, which Redbud was not staffed or equipped to treat.
 
 
 30
 The survivors argue that the district court erroneously granted summary judgment to Redbud on their § 1317 claim, because there was a genuine issue of material fact as to the reasonableness of Redbud's care. They contend that the provision in § 1317(c) precluding liability "if a refusal to render emergency services or care... is based on the determination, using reasonable care, that the person is not suffering from an emergency condition" establishes a reasonable care standard for liability under § 1317(a). They further argue that the opinions provided by their medical experts constitute material evidence supporting the conclusion that Redbud doctors did not act reasonably when they determined that Jackson was suffering from a psychological, and not a physical, condition.
 
 
 31
 We have considered § 1317 only once, and the California Supreme Court has never addressed a § 1317 claim.[5] In Brooker we referred to the exercise of reasonable care, but that case involved a hospital's decision not to perform a procedure. Therefore, Brooker implicated § 1317(c), and its reasonable care standard. Brooker was admitted to the Desert Hospital emergency room, complaining of chest pains. The physician who treated her determined that the best course of action was immediate bypass surgery, but the hospital's cardiac surgeon was unavailable to perform the surgery due to a prior teaching commitment. The physician performed an angioplasty to keep Brooker's aorta clear, and then recommended that she consent to a transfer to another hospital, where a cardiac surgeon would be able to perform the bypass. Brooker consented to the transfer, but she suffered a heart attack en route to the other hospital. Once she arrived at that hospital, she underwent successful bypass surgery. Brooker, 947 F.2d at 413-14. On appeal, Brooker argued that Desert Hospital violated § 1317 because the cardiac surgeon's unavailability was not the product of events outside the hospital's control. We rejected the plaintiff's argument, and we affirmed the grant of summary judgment to the hospital because, "[t]he district court determined that Brooker's transfer was based on a decision, made pursuant to the exercise of reasonable care, that qualified personnel were unavailable to render emergency services." Id. at 416.
 
 
 32
 The logical reading of § 1317, which we adopt, is that § 1317(c)'s duty of reasonable care only applies in two situations: First, it applies when the hospital does not provide a medical screening, examination, or evaluation to determine if the patient presents an emergency medical condition. Such a failure constitutes "a refusal to render "emergency services and care." See Cal. Health & Safety Code§§ 1317(c), 1317.1(a)(1). There is no dispute that Redbud provided medical screenings and examinations designed to determine if Jackson suffered from an emergency medical condition.
 
 
 33
 Second, § 1317(c)'s duty of reasonable care applies when a doctor diagnoses a condition, but declines to provide treatment because he determines either that the condition is not an "emergency medical condition" or that the hospital does not have the appropriate facilities or personnel to provide care. Such an interpretation is consistent with the inclusion of the "reasonable care" requirement in§ 1317(c), which governs refusals of care, but its omission in § 1317(a), which is the provision that imposes obligations on hospitals and physicians. If a hospital does not diagnose an emergency condition, it cannot "refus[e] to render emergency care," because one cannot "refuse" to treat a condition one does not detect. Brooker involved such a refusal: the Desert Hospital physician concluded that Brooker needed bypass surgery to remedy her emergency condition. Therefore, Desert Hospital and its physicians had a duty to exercise reasonable care when they determined that Brooker would not receive the bypass at their hospital. The facts before us are quite different: The Redbud physicians never declined to provide a procedure needed to treat Jackson's diagnosed condition. Therefore, Redbud's potential liability must be judged against the standard in § 1317(a), and not the reasonable care standard in § 1317(c). There is no genuine issue of material fact to contradict the conclusions that Jackson received a "medical screening... to determine if an emergency medical condition exists " and that he received the "care [and] treatment... necessary to relieve or eliminate the emergency medical condition" diagnosed by the Redbud physicians. Cal. Health & Safety Code § 1317.1(a)(1). The district court properly granted summary judgment to Redbud on the § 1317 claim.
 
 IV.
 
 34
 Noting that the non-statutory claims against Adventist were tort claims, the district court held that Adventist's liability, if any, could only arise out of its contractual relationship with Redbud under a joint venture or joint tortfeasor theory of liability. The district court then held that Adventist and Redbud were neither joint venturers nor joint tortfeasors. On appeal, the survivors argue that Adventist is directly liable under EMTALA, and that the district court erroneously concluded that Adventist and Redbud were neither joint venturers nor joint tortfeasors.
 
 A.
 
 35
 The argument that Adventist is directly liable under EMTALA contradicts our precedents and the statutory definition of a "hospital." In Eberhardt, we rejected a claim of physician liability under EMTALA, because, "The plain test of the EMTALA explicitly limits a private right of action to the participating hospital." 62 F.3d at 1256. Title 42 (which includes EMTALA) defines a hospital as an institution which provides diagnostic services, treatment, and care to patients. 42 U.S.C. § 1395x(e). Redbud was a "participating hospital" because it was a "hospital" which participated in Medicare.[6] Adventist provided administrative, purchasing, and financial services to Redbud pursuant to the Association Agreement. It was not a "hospital," and it did not participate in Medicare. Therefore, the district court correctly concluded that Adventist could not be held directly liable under EMTALA.
 
 B.
 
 36
 The survivors next argue that the Association Agreement created a joint venture or joint enterprise between Redbud and Adventist. If Redbud and Adventist entered into a joint venture or joint enterprise, any negligence by Redbud would be imputed to Adventist. County of Riverside v. Loma Linda Univ., 173 Cal. Rptr. 371, 376 n.3 (Cal. Ct. App. 1981) ("Loma Linda"). Under California law,"[t]he term `joint venture' usually connotes a commercial objective. It exists where there is an agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses and a right of joint control." Id. (internal quotation marks omitted).
 
 
 37
 The district court analyzed the Association Agreement, and found that the relationship created by the Agreement did not qualify as a joint venture under California law. Jackson's survivors argue that the district court misapplied the law of joint liability because it concentrated on the lack of profit-sharing between Redbud and Adventist, and it ignored the principle that a joint enterprise (as opposed to a joint venture) can exist in a non-commercial setting. The distinction between a joint venture and a joint enterprise is not a clear one. See Loma Linda, 173 Cal. Rptr. at 376 & n.4 ("The term`joint enterprise' is sometimes used to define a noncommercial undertaking entered into by associates with equal voice in directing the conduct of the enterprise, but when used to describe a business or commercial undertaking it has been used interchangeably with the term `joint venture' and courts have not drawn any significant legal distinction between the two."). In Loma Linda, the parties to the agreement were a county hospital and a university medical school, and the agreement concerned the medical school's provision of teaching services to the hospital. This was a non-commercial undertaking, yet the court analyzed it as a joint venture, and not a joint enterprise, implying that there is no difference between the two relationships. In the case before us, any distinction that might exist between a joint venture and a joint enterprise is a distinction without a difference, because the Association Agreement preserved Redbud and Adventist's status as independent entities with respect to Jackson's care, and because Redbud and Adventist did not exercise joint control over the operation of the hospital.
 
 
 38
 "Whether the parties to a contract have created a joint venture or some other relationship involving cooperative effort depends upon their actual intention which must be determined in accordance with ordinary rules governing interpretation of contracts. Where evidence bearing on the issue is conflicting, the existence of a joint venture is primarily a question of fact. On the other hand, where there is no conflicting extrinsic evidence concerning the interpretation of the contract creating the relationship, the issue is one of law." Id. at 377 (citations omitted).
 
 
 39
 The Association Agreement clearly states that Redbud and Adventist would "remain separate corporations, and shall retain their respective rights, privileges... duties, liabilities, both public and private in nature, and their respective operations and programs." During the life of the agreement, it was Redbud's responsibility to "maintain and operate[the hospital], and to comply with all applicable provisions of law." Adventist's responsibilities were limited to providing administrative, financial, and purchasing services to Redbud. The Association Agreement also provided that the Redbud executive director would be an Adventist employee. The Agreement was limited in scope, particularly with respect to patient care, which remained Redbud's responsibility. Adventist did not have a right of joint control over hospital operations (a prerequisite to finding a joint venture), and it did not have an equal voice in directing the conduct of the enterprise (a pre- requisite to finding a joint enterprise). The absence of a provision dividing revenues or sharing losses further precludes a finding of a joint venture. The district court properly concluded that Adventist could not be held liable as a participant in either a joint venture or a joint enterprise.
 
 C.
 
 40
 The survivors also argue that the district court erred when it concluded that Adventist and Redbud were not joint tortfeasors. Under California law, a court must balance six factors to determine whether a party to a contract can be held liable in tort to a third party for its negligent performance of its contractual obligations:
 
 
 41
 (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury suffered; (5) the moral blame attached to the defendant's conduct; and (6) the policy of preventing future harm.
 
 
 42
 Loma Linda, 173 Cal. Rptr. at 379 (citing Biakanja v. Irving, 320 P.2d 16 (Cal. 1958)). In light of the limited role Adventist played in the provision of patient care, the district court properly concluded that Adventist's connection to Jackson's injury was too tenuous to support a conclusion that Adventist owed Jackson a duty of care. The district court properly determined that Adventist was not Redbud's joint tortfeasor.
 
 V.
 
 43
 The district court properly granted summary judgment to Redbud and Adventist on Jackson's survivors' EMTALA and § 1317 claims. The district court also properly held that Adventist was not liable, as a matter of law, on their other state law claims.
 
 
 44
 AFFIRMED.
 
 
 
 NOTES:
 
 
 [1]
 Anafranil is an antidepressant, used to treat obsessive-compulsive disorders. Ativan is an anti-anxiety agent.
 
 
 [2]
 Benadryl is an antihistamine, with sedative side effects. Haldol is a tranquilizer used to manage the manifestations of psychotic disorders.
 
 
 [3]
 Jackson's survivors' claims against East Bay Hospital and the physicians were resolved in proceedings not pertinent to this appeal.
 
 
 [4]
 In Sections II and III of this opinion, references to Redbud also include Adventist. Jackson's survivors' arguments that Adventist is liable under EMTALA as a "participating hospital," and is liable as Redbud's joint venturer or joint tortfeasor are discussed in Section IV.
 
 
 [5]
 The California Court of Appeal has addressed § 1317 claims, but the cases before that court concerned issues and statutory provisions unrelated to this appeal.
 
 
 [6]
 EMTALA only applies to hospitals which choose to participate in Medicare. See 42 U.S.C. § 1395cc, 1395dd.
 
 
 
 45
 TASHIMA, Circuit Judge, concurring in part and dissenting in part:
 
 
 46
 I concur in all of the majority opinion, except Part III. Because I believe that the majority's interpretation of Cal. Health & Safety Code § 1317 is mistaken, I respectfully dissent from that portion of the opinion.
 
 Section 1317(a) provides:
 
 47
 Emergency services and care shall be provided to any person requesting the services or care, or for whom services or care is requested, for any condition in which the person is in danger of loss of life, or serious injury or illness, at any health facility licensed under this chapter that maintains and operates an emergency department to provide emergency services to the public when the facility has appropriate facilities and qualified personnel available to provide the services or care.
 
 
 48
 Cal. Health & Safety Code § 1317(a). The statute defines "emergency services and care" as
 
 
 49
 medical screening, examination, and evaluation by a physician... to determine if an emergency medical condition or active labor exists and, if it does, the care, treatment, and surgery by a physician necessary to relieve or eliminate the emergency medical condition, within the capability of the facility.
 
 
 50
 Id. § 1317.1(a)(1). The statute also contains a "safe harbor" provision:
 
 
 51
 Neither the health facility, its employees, nor any physician and surgeon... shall be liable in any action arising out of a refusal to render emergency services or care if the refusal is based on the determination, exercising reasonable care, that the person is not suffering from an emergency condition, or that the health facility does not have the appropriate facilities or qualified personnel available to render those services.
 
 
 52
 Id. § 1317(c). There is no California case law interpreting any of these provisions.
 
 
 53
 On its face, § 1317(c) provides that a health facility shall not be liable for refusal to provide medical services, if the refusal was based upon a determination either that the patient did not have an emergency medical condition or that the health facility could not provide appropriate services, as long as that determination was made with reasonable care. Jackson's survivors contend that the negative implication of § 1317(c) is that a facility that fails to exercise reasonable care in its diagnostic procedures is liable under§ 1317(a), i.e., that § 1317(c)'s safe harbor for diagnoses performed with reasonable care implies that § 1317(a) imposes liability for diagnoses performed without reasonable care.
 
 
 54
 The majority rejects the argument, however, by, in effect, concluding that § 1317(c) does not mean what it says. As the majority construes it, § 1317(c) applies only"when a doctor diagnoses a condition, but declines to provide treatment because he determines either that the condition is not an `emergency medical condition' or that the hospital does not have the appropriate facilities or personnel to provide care." Maj. op. at 1258 (emphasis added). Thus, for a doctor to get the benefit of § 1317(c)'s safe harbor, the doctor must diagnose some condition (e.g., an upset stomach) and then determine either that it is not an emergency condition or that the hospital cannot treat it. A doctor who, exercising reasonable care, fails to diagnose any condition at all does not get the benefit of the safe harbor. But § 1317(c) says it applies "if the refusal is based on the determination, exercising reasonable care, that the person is not suffering from an emergency condition...." Such a determination could be based on a diagnosis that the patient is not suffering from any condition at all, as well as on a diagnosis that the patient is suffering from some condition that is not an emergency condition. One can "refuse to render emergency care" based on a diagnosis that the patient is suffering from no medical condition at all, as well on a diagnosis of a condition that is thought not be an "emergency medical condition." Thus, a plain, facial reading of § 1317(c) does not support the majority's interpretation of it, no principle of statutory construction supports it, and there is no reason to believe that the California Legislature would draw such a distinction.
 
 
 55
 The majority's only argument in support of its interpretation is the following: "If a hospital does not diagnose an emergency condition, it cannot `refus[e] to render emergency care,' because one cannot `refuse' to treat a condition one does not detect." Maj. op. at 1258-59. I disagree with this reasoning. Section 1317(c) speaks of "refusal to render emergency services or care," not refusal to treat an identified condition. One can certainly refuse to render emergency services or care to a patient on the ground that one finds the patient to be suffering from no medical condition at all, emergency or nonemergency.
 
 
 56
 Because the majority refuses to read § 1317(c)'s safe harbor provision according to its plain terms, it is able to sidestep the survivors' argument regarding the implications of that safe harbor under § 1317(a). The majority believes that § 1317(a) contains its own "standard" of care. See maj. op. at 1258.This, too, is a mistake. In my view, § 1317(a) only sets forth the duty to provide emergency services and care and it is § 1317(c) that provides the standard of care. Under that standard of care, there clearly are genuine issues of material fact as to whether the hospital exercised reasonable care in its screening and evaluation procedures.
 
 
 57
 For these reasons, I would reverse the grant of summary judgment in defendants' favor on the § 1317 claim and remand that claim for trial. I therefore dissent from Part III.