Sarah **BAKER**, a Minor, individually and as Successor–in–Interest to Henry Baker, deceased, by and through her guardian ad litem, Lorie McKinnon, Plaintiff–Appellant,

v.

**ADVENTIST HEALTH, INC.**; Redbud Community Hospital District; Wolfgang Schug, M.D.; Janzen, Johnston & Rockwell Emergency Medical Group of California, Inc., Defendants–Appellees.

No. 00–15273.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 12, 2001

Filed Aug. 6, 2001

Richard J. Massa, Massa & Associates, Lakeport, California, for the plaintiff-appellant.

Mitchell C. Tilner and Orly Degani, Horvitz & Levy, LLP, Encino, California; John S. Gilmore, Goldsberry, Freeman & Swanson, Sacramento, California; and David A. Heck, Bradley, Curley, Asiano & McCarthy, PC, San Francisco, California, for the defendants-appellees.

Before: SCHROEDER, Chief Judge, LAY,* THOMPSON, Circuit Judges.

SCHROEDER, Chief Judge.

This case arises out of the tragic death of Henry Baker, who committed suicide two days after being released from the Redbud Community Hospital emergency room. The primary issue is whether the hospital violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, when it called in a crisis worker from the county mental health department to screen Baker for a psychiatric emergency. The district court granted summary judgment in favor of the defendants on the ground that EMTALA requires the hospital only to provide a screening examination that is within the capability of its emergency department, and therefore could not have violated the statute by calling in an outside expert to perform a screening that was beyond the hospital's capabilities. We affirm.

## BACKGROUND

Redbud Community Hospital ("Redbud") is a 40–bed rural hospital located in Clearlake, California. It operates an emergency room, but it does not offer psychiatric treatment and has no psychiatrists, psychologists, or any other mental health professionals on staff. The hospital has a written policy that directs emergency room personnel to consult with the Lake County Mental Health Department ("Lake County") when dealing with patients who present possible psychiatric emergencies.

On September 25, 1996, Henry Baker was brought to the hospital by his former sister-in-law and her fiance, with whom Baker lived. The nurse who triaged him recorded his chief complaint as "request mental health evaluation." The nurse checked his vital signs, noted no obvious physical problems, and classified Baker's triage status as "delayed," meaning that he was in a stable condition, was in no distress, and was entitled to less priority than patients with life-threatening or urgent needs.

About ninety minutes later, Baker was examined by Dr. Wolfgang Schug, an emergency room physician on Redbud's medical staff. Dr. Schug recorded a patient history that includes the notation, "Last 90 days 'apathetic,' unable to communicate, depressed. Suicide 'constantly' in back of mind." Dr. Schug concluded that Baker had no physical or medical condition requiring immediate care, and recorded his diagnosis as "(1) Depression (2) Medical clearance for Mental Health."

Redbud has a written policy requiring the emergency department to request a mental health evaluation from Lake County if the medical screening turns up evidence of a "psychiatric disturbance" or symptoms of substance abuse. Patients must be "medically cleared" before Lake County is called to perform a mental health evaluation. The policy provides that the emergency physician's examination must be "sufficient to rule out any organic causes of the aberrant behavior."

In accordance with hospital policy, Dr. Schug contacted Lake County to request a mental health evaluation of Baker. In his telephone call to Lake County, Dr. Schug reported that Baker was not saying that

---

* The Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, sitting by designation.

he was suicidal, according to the undisputed facts. Dr. Schug testified in his deposition that he could not tell whether Baker was a danger to himself, and called Lake County to have them make that determination.

Within one half hour of Dr. Schug's call, Lake County crisis worker Dennis Skinner and a trainee arrived at Redbud. Skinner had an M.S. degree in counseling psychology. He examined Baker and concluded that he did not meet the criteria for an involuntary hold under the applicable state statute, California Welfare & Institutions Code § 5150, because Baker did not constitute a danger to himself or others.

Baker was discharged from Redbud after he agreed to go to Lake County the following day to complete paperwork in order to qualify for medical expenses and social services, and to receive an assessment by a clinician for possible referral to a psychiatrist for the treatment of depression. Both Dr. Schug and Baker signed the discharge record, which noted that there was to be a mental health follow-up. Baker's body was found two days later after he had hanged himself from a tree.

This suit was filed on behalf of Baker's minor daughter in 1997. She sought damages and injunctive relief for violations of EMTALA and California Health & Safety Code § 1317, as well as for medical negligence under state law. After discovery, the district court granted summary judgment in 1999 for the defendants on the EMTALA and § 1317 claims. The district court declined to exercise supplemental jurisdiction over the remaining state law claims and dismissed the action. This appeal followed.

## DISCUSSION

### A. EMTALA

The essence of plaintiff's case is that Redbud was required under EMTALA to provide a psychiatric examination with the hospital's own personnel, and that it violated the statute by calling in Lake County to screen Baker for a psychiatric emergency. The plaintiff further contends that the hospital violated EMTALA by failing to stabilize an emergency medical condition, by disparately applying its mental health policy to Baker, by discriminating against persons who have psychiatric as opposed to physical emergency conditions, and by improperly transferring Baker to Lake County before he was stabilized.

■ EMTALA imposes two duties on hospital emergency rooms: a duty to screen a patient for an emergency medical condition, and, once an emergency condition is found, a duty to stabilize the patient before transferring or discharging him. *See* 42 U.S.C. § 1395dd; *Jackson v. East Bay Hospital,* 246 F.3d 1248, 1254–55 (9th Cir.2001). The statute requires the emergency department to "provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition ... exists." 42 U.S.C. § 1395dd(a).[1] If the

---

1. "Emergency medical condition" means active labor or, in the definition relevant here:
   (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in(i) placing the health of the individual ... in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part....

42 U.S.C. § 1395dd(e)(1)(A). Under the applicable regulations, a psychiatric disturbance may constitute an emergency medical condition. 42 C.F.R. § 489.24(b)(i) (2000). The Health Care Financing Administration

hospital determines that an individual has an emergency medical condition, it must provide "within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1)(A).

■ The hospital's duty to stabilize arises only when it actually detects an emergency medical condition. *Jackson,* 246 F.3d at 1257. If the patient's condition has not been stabilized,[2] the hospital may not transfer[3] the patient to another medical facility unless (1) the patient or her proxy requests a transfer in writing, or (2) a physician or other medical professional certifies that the medical benefits available at the other facility outweigh the risks of transfer. *See* 42 U.S.C. § 1395dd(c)(1). Any transfer of a patient whose emergency medical condition has not been stabilized must comply with additional requirements set forth in the statute in order to qualify as an "appropriate transfer." *See* 42 U.S.C. § 1395dd(c)(2).

■ Congress enacted EMTALA to respond to the specific problem of hospital emergency rooms refusing to treat patients who were uninsured or who could otherwise not pay for treatment. In such situations, emergency rooms would either decline to provide treatment or transfer patients in an unstable condition to other hospitals, thereby jeopardizing patients' health. *See* H.R.Rep. No. 99–241, pt. I, at 27 (1985), *reprinted in* 1986 U.S.C.C.A.N. 579, 605; *Jackson,* 246 F.3d at 1254.

■ The statute is not intended to create a national standard of care for hospitals or to provide a federal cause of action akin to a state law claim for medical malpractice. *See Eberhardt v. City of Los Angeles,* 62 F.3d 1253, 1258 (9th Cir.1995). The statute expressly contains a non-preemption provision for state remedies. *See* 42 U.S.C. § 1395dd(f). Indeed, we recently held, in a case that ironically also involved Redbud, that the hospital did not violate EMTALA even though it misdiagnosed an emergency condition as a psychiatric rather than a medical condition. *See Jackson,* 246 F.3d at 1256–57.

■ The novel argument plaintiff makes in this case is that the hospital should have provided a mental health screening itself rather than calling in the county mental health department. This is not a tenable position under the statute, however, for the statute explicitly limits the screening examination that the hospital is required to provide to one that is "within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department." The hospital did not have the capability to perform a mental health screening. Nor are mental health services listed in Redbud's written policy detailing ancillary services available to the emergency department. Redbud therefore did not have any duty to provide Baker with a mental health screening. For purposes of our EMTALA analysis, the mental health evaluation performed by Lake County was entirely gra-

("HCFA") has interpreted an emergency medical condition in the psychiatric context to mean that an individual poses a danger to himself or others. *See HCFA State Operations Manual,* Appendix V, at V–22, *available at* http://www.hcfa.gov/pubforms/progman.htm.

2. "Stabilized" means, in relevant part, "that no material deterioration of the condition is likely, within reasonable medical probability,

to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(B).

3. The pertinent definition of "transfer" is "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital...." 42 U.S.C. § 1395dd(e)(4).

tuitous. Redbud discharged its responsibility under EMTALA by performing a medical screening. Accordingly, Redbud did not violate EMTALA by calling in Lake County to conduct a mental health evaluation that was beyond the hospital's capabilities.

■ The plaintiff argues that psychiatric services were indeed within the capability of Redbud's emergency department, since Dr. Schug took psychiatry courses during medical school and has been exposed to psychiatric patients as an emergency room physician. Plaintiff does not contend and could not successfully contend that such experience could give Dr. Schug any material expertise in psychiatry beyond that of the ordinary medical doctor with some emergency room experience. Moreover, "hospitals, and not reviewing courts, are in the best position to assess their own capabilities." *Repp v. Anadarko Municipal Hosp.*, 43 F.3d 519, 522 (10th Cir.1994). A standard screening policy for patients entering the emergency room generally defines which procedures are within a hospital's capabilities. *See id.* Here, Redbud's policy required Lake County crisis workers, rather than Redbud staff, to perform mental health screenings. The uncontested evidence establishes that mental health screenings were beyond the capability of Redbud's emergency department.

■ The plaintiff suggests, in an alternative argument, that Dr. Schug in fact did detect a medical emergency. This factual contention is not supported by the record. Dr. Schug testified in his deposition that he knew that Baker suffered from a psychiatric condition that might make him a danger to himself or others, but this does not constitute actual detection of an emergency medical condition. *See Jackson*, 246 F.3d at 1257. Under hospital policy, Dr. Schug was required in those circumstances to call in Lake County to determine whether or not an emergency existed. Since Dr. Schug never detected a medical emergency, Redbud had no duty under EMTALA to stabilize Baker before discharging him. *See id.*

■ Plaintiff next contends that Redbud violated EMTALA by disparately applying its screening policy to Baker. Disparate treatment can constitute a violation of EMTALA's requirement that a hospital provide an "appropriate medical screening." *See Jackson*, 246 F.3d at 1256. "Evidence that a hospital did not follow its own screening procedures can support a finding of EMTALA liability for disparate treatment." *Battle v. Mem. Hosp.*, 228 F.3d 544, 558 (5th Cir.2000). Plaintiff argues that the provision of Redbud's mental health policy calling for the physician and Lake County crisis worker jointly to develop a treatment plan was violated in this case, since, she maintains, Skinner discharged Baker without input from Dr. Schug. She cites the evidence that Dr. Schug, Skinner, and the Lake County trainee do not recall whether Dr. Schug and Skinner conferred to discuss Baker's treatment plan.

We conclude that the evidence before us indicates that the hospital policy was properly applied in this case. The discharge sheet was signed by Dr. Schug and includes, in his handwriting, the instruction, "Per Mental Health—Follow-up with them." Dr. Schug testified in his deposition that he could not have written these instructions to the patient until he knew of the disposition recommended by Lake County, which indicates that he must have conferred with Skinner. Dr. Schug further testified that his custom was to discuss the dispositions of mental health patients with the Lake County crisis worker. The district court held that there was insufficient evidence to create a triable issue of fact as to any disparate application of

Redbud's mental health screening policy, and we agree.

Plaintiff also argues that the hospital violated EMTALA by discriminatorily failing to provide screening for psychiatric emergencies, while it provided screening for physical emergencies. EMTALA explicitly recognizes the differences among the capabilities of hospital emergency rooms, so the statute limits the screening required to one that is within the capability of a given emergency department. *See* 42 U.S.C. § 1395dd(a). It follows that Redbud cannot be charged with discriminating against psychiatric patients by failing to provide them with psychiatric screenings, where the hospital lacked any mental health capability.

More fundamentally, plaintiff's argument overlooks the central purpose of EMTALA, which is to forbid hospitals from providing different emergency care to patients on the basis of the patients' ability to pay. *See Jackson*, 246 F.3d at 1254. In keeping with the purpose of the statute, we have held that a screening is "appropriate" within the meaning of EMTALA if it:

> provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, unless the examination is so cursory that it is not "designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury."

*Jackson*, 246 F.3d at 1256, *quoting Eberhardt*, 62 F.3d at 1257.

Hospitals are not required to provide patients presenting different symptoms with identical screenings. Nor are hospitals required under EMTALA to provide screenings that are beyond their capabilities. The district court properly concluded that Redbud did not violate

EMTALA by failing to provide screenings for psychiatric emergencies.

The remaining contention is that Redbud violated EMTALA by "transferring" Baker to Lake County before he was stabilized. As we have discussed, Dr. Schug's examination was the only screening required under EMTALA, since a mental health screening was not within Redbud's capabilities. Since Dr. Schug did not detect an emergency medical condition, no duty to stabilize prior to transfer arose.

Even if a duty to stabilize had arisen here, Dr. Schug's request for an examination by Lake County was not a "transfer" within the meaning of EMTALA. The statute defines "transfer" in relevant part as "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital . . . ." 42 U.S.C. § 1395dd(e)(4). There was no movement of Baker outside the hospital's facilities, since Skinner performed the mental health evaluation of Baker in Redbud's emergency room. Accordingly, there was no transfer to Lake County.

The district court properly concluded that there is no triable issue of fact as to whether Redbud violated its duties under EMTALA.

### B. California State Law Claims

Plaintiff has also asserted a claim under California Health & Safety Code § 1317, which is analogous to EMTALA. *See Brooker v. Desert Hospital Corp.*, 947 F.2d 412, 415 (9th Cir.1991). Plaintiff argues that the district court erred in considering defendants' motion for summary judgment on the § 1317 claim. In opposing the motion for summary judgment, plaintiff noted that the magistrate judge had entered a protective order limiting discovery to the

EMTALA claim. In her opposition, plaintiff requested a continuance under Federal Rule of Civil Procedure 56(f) in order to conduct discovery on the § 1317 claim.

■ To merit a continuance for additional discovery under Rule 56(f), the party opposing summary judgment must file an affidavit specifying the facts that would be developed through further discovery. *See In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 989 (9th Cir.1999). Plaintiff failed to do so. Accordingly, the district court did not abuse its discretion in reaching the merits of defendants' motion for summary judgment on the § 1317 claim.

Section 1317(a) creates a duty for health facilities to provide emergency services and care:

> Emergency services and care shall be provided to any person requesting the services or care, or for whom services or care is requested, for any condition in which the person is in danger of loss of life, or serious injury or illness, at any health facility licensed under this chapter that maintains and operates an emergency department to provide emergency services to the public when the health facility has appropriate facilities and qualified personnel available to provide the services or care.

Cal. Health & Safety Code § 1317(a).

Section 1317.1 defines "emergency services and care" as:

> [M]edical screening, examination, and evaluation by a physician, or, to the extent permitted by applicable law, by other appropriate personnel under the supervision of a physician, to determine

if an emergency medical condition or active labor exists and, if it does, the care, treatment, and surgery by a physician necessary to relieve or eliminate the emergency medical condition, within the capability of the facility.

Cal. Health & Safety Code § 1317.1.[4]

■ Plaintiff argues that the defendants violated § 1317 in two ways. First, she contends that Redbud violated § 1317.1's requirement that Baker receive a medical screening by a physician. Second, plaintiff argues that Redbud actually detected an emergency psychiatric condition, but violated the statute by failing to treat the condition. The text of § 1317(a) effectively refutes plaintiff's contentions. The duty to provide any emergency medical services, including a screening, attaches only when "the health facility has appropriate facilities and qualified personnel available to provide the services or care." Because Redbud lacked mental health capabilities, it had no duty to provide a psychiatric screening of Baker or any mental health care for him. Therefore, the district court properly granted summary judgment for defendants on the § 1317 claim.

■ The remaining state law claims were dismissed because the district court declined to exercise supplemental jurisdiction. There was no abuse of discretion, since the federal claim had been disposed of on the merits. *See* 28 U.S.C. § 1367(c)(3); *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1189 (9th Cir.2001).

---

**4.** In 1999, § 1317.1 was amended to add the following definition:

> "Emergency services and care" also means an additional screening, examination, and evaluation by a physician, or other personnel to the extent permitted by applicable law and within the scope of their licensure

and clinical privileges, to determine if a psychiatric emergency medical condition exists, and the care and treatment necessary to relieve or eliminate the psychiatric emergency medical condition, within the capability of the facility.

Cal. Health & Safety Code § 1317.1(a)(2)(A).

## CONCLUSION

Henry Baker's death was the product of a psychiatric disturbance. His failure to receive adequate psychiatric treatment signifies a broader problem: the scarcity of mental health services in rural areas of the country. *See Mental Health: A Report of the Surgeon General* 455 (1999), *available at* http://www.surgeongeneral.gov/library/mentalhealth/home.html; David Hartley et al., *Rural Mental Health and Substance Abuse, in Rural Health in the United States* 159, 159 (Thomas C. Ricketts, III, ed., 1999). His daughter's effort to seek redress under EMTALA is misdirected, however, because the statute addresses the separate problem of hospitals' denial of emergency medical care to patients who are unable to pay. Accordingly, we AFFIRM the district court's grant of summary judgment for defendants on plaintiff's EMTALA and § 1317 claims.

AFFIRMED.