**Jacob MAGRUDER, by his natural parents, Richard MAGRUDER and Michelle Magruder, and Richard Magruder and Michelle Magruder, individually, Plaintiffs,**

v.

**JASPER COUNTY HOSPITAL, Defendant.**

**Cause No. 4:01 CV 0067.**

United States District Court, N.D. Indiana, Hammond Division.

Jan. 30, 2003.

Mary J. Hoeller, White and Raub, Indianapolis, IN, for plaintiffs.

Nolan Kent Smith, Sr., James Brendan Hogan, Hall Render Killian Heath and Lyman, Indianapolis, IN, for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

On or about November 20, 2001, the Plaintiffs, Jacob Magruder, by his natural parents, Richard and Michelle Magruder, and Richard and Michelle Magruder individually, ("the Magruders") filed a complaint for medical negligence before the Indiana Department of Insurance pursuant to the Indiana Medical Malpractice Act, I.C. §§ 34–18–1–1 to 18–2, alleging, in part, that Defendant, Jasper County Hospital ("JCH") committed medical malpractice in the care and treatment rendered to their son, Jacob Magruder on or about May 8, 2001. Thereafter, on November 21, 2001, the Magruders filed a complaint under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"), based on the care and treatment rendered to Jacob Magruder in the Hospital's emergency department during the evening of May 8, 2001. This federal statute became effective in 1986 as a part of the Consolidated Budget Reconciliation Act of 1986, often referred to as "COBRA." *See* Pub.L. No. 99–272, 100 Stat. 82, 164–67 (1986). This matter is before the Court on Defendant's, JCH, motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This Court heard oral argument in Lafayette, Indiana on January 24, 2003. This Court has given close attention to the materials presented at oral argument by Plaintiff's counsel.

## I. BACKGROUND

On May 8, 2001, at approximately 5:34 p.m., the Magruders arrived at the JCH emergency department along with their son Jacob Magruder for diagnosis and

treatment of redness and tenderness in the child's groin area. A history was taken from Ms. Magruder by Marlene Murphy, a nursing technician at JCH. Ms. Murphy took the child's vital signs and recorded them. The child was then examined by Cheryl Querry, R.N. Nurse Querry recorded that the child was alert and that his skin was pink, warm, and dry. Nurse Querry confirmed the history as taken by Ms. Murphy and Jacob Magruder was then triaged by Nurse Querry as "Non-urgent."

Dr. Kenneth Ahler was the emergency room physician on duty during the evening of May 8, 2001. Dr. Ahler performed an examination on Jacob Magruder and determined that the child was fretful but not in any acute pain. Dr. Ahler examined the child's abdomen and scrotum and noted that the child had a hard, fixed mass on the left side of his abdomen. Dr. Ahler diagnosed the child as having a left direct inguinal hernia. Dr. Ahler also noted that there was no left testicle in the scrotum but that the child had bowel sounds present. Dr. Ahler attempted to manually reduce the hernia by applying pressure, but the hernia was found not to be manually reducible.

Based upon his examination, Dr. Ahler determined that the child was not in severe ischemic pain and that he did not have an acute ischemic testicle. Further, he did not believe that the bowel was involved since bowel sounds were present. However, Dr. Ahler did believe the child's testicle was involved in the hernia and advised the family that the child would need surgery. However, Dr. Ahler did not believe that the child needed emergency surgery. Dr. Ahler discussed the option of having the child seen by Dr. Razvi the following morning and indicated that the child could be admitted that night to JCH or that he could go home and be brought back the following morning. The Magru-ders elected to take Jacob Magruder home for the night and return to JCH with him the following morning. Jacob Magruder was discharged in stable condition with instructions to see Dr. Razvi the following day. When the Magruders arrived at JCH for surgery on the morning of May 9, 2001, Dr. Kelly executed an EMTALA transfer of Jacob Magruder to Riley Children's Hospital in Indianapolis, where, despite efforts, Jacob unfortunately suffered the loss of his left testicle.

The Magruders claim that eighteen-month-old Jacob Magruder did not receive an appropriate emergency medical screening at JCH when he presented in the emergency department for care of a red, tender and swollen left testicle on May 8, 2001. The Magruders contend that as a result of JCH's EMTALA violations, Jacob lost his left testicle. JCH moves the Court for summary judgment in its favor on the basis that there is no genuine issue of material fact regarding the Magruders' EMTALA claim.

## II. STANDARD OF REVIEW

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Bragg v. Navistar Int'l Trans. Corp.,* 164 F.3d 373 (7th Cir.1998). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting FED.R.CIV.P. 56); *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497 (7th Cir.1998). A question of material fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts shows that there is a genuine [material] issue for trial.'" *Id.* The nonmoving party cannot rest on its pleadings, *Weicherding v. Riegel*, 160 F.3d 1139 (7th Cir.1998); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918 (7th Cir.1994); nor may that party rely upon conclusory allegations in affidavits. *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 320 (7th Cir.1995).

During its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560 (7th Cir.1996). Furthermore, it is required to analyze summary judgment motions under the standard of proof relevant to the case or issue. *Anderson*, 477 U.S. at 252–55, 106 S.Ct. 2505. Applying the above standard, this Court now addresses defendant's motion.

## III. DISCUSSION

### A. The Emergency Medical Treatment and Active Labor Act (EMTALA)

Congress enacted EMTALA in response to the growing concern about the provision of medical services in hospital emergency rooms to individuals who are indigent and uninsured. Congress was concerned that hospitals were "dumping" patients who were unable to pay for care either by refusing to provide emergency treatment or by simply transferring those patients to other hospitals before the patient's condition was stabilized. *See* H.R.Rep. No. 241, 99th Cong., 1st Sess., Part I at 27 (1985), *reprinted in* 1986 U.S.Code Cong. & Admin. News, 579, 605. Although prompted by concern for the poor, the provisions of EMTALA protect all individuals. *See Bryant v. Adventist Health System/West*, 289 F.3d 1162 (9th Cir.2002). The cases which have analyzed the statute seem to conclude that EMTALA imposes two duties, commonly referred to as the "Screening Requirement" and the "Stabilization Requirement." *Hicklin v. WBH Evansville, Inc.*, 2001 WL 1768422 (S.D.Ind.2001).

By its terms, EMTALA imposes duties on hospital emergency departments. The first of these duties is that the hospitals must provide an appropriate medical screening examination within the capability of the hospital's emergency department. 42 U.S.C. § 1395dd(a). This examination is intended to determine whether or not an emergency medical condition exists. *Id.* Under 42 U.S.C. § 1395dd(e)(1)(A), an emergency medical condition is defined as:

A medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(i) placing the health of the individual in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part . . .

The second duty is that in the event the hospital detects the presence of an emergency medical condition, under 42 U.S.C. § 1395dd(b)(1) the hospital must provide either:

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

In summary, under the statutory framework, EMTALA requires screening and stabilization.

### 1. "Screening Requirement"

■ EMTALA has been universally construed as *not* establishing for hospitals a national standard of care for screening patients in the emergency department. *See, Bryant,* 289 F.3d 1162 (9th Cir.2002); *Jackson v. East Bay Hospital,* 246 F.3d 1248 (9th Cir.2001); *Phillips v. Hillcrest Medical Center,* 244 F.3d 790 (10th Cir. 2001); *Summers v. Baptist Medical Center,* 91 F.3d 1132, 1137 (8th Cir.1996). While the provisions of EMTALA do not specifically define the content of an "appropriate medical screening," the Courts have achieved a consensus on a method of assessing the appropriateness of a medical examination in the EMTALA context. A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints. *See Baber v. Hospital Corp. of Am.,* 977 F.2d 872, 879 (4th Cir.1992); *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C.Cir.1991).

■ It was held in *Summers,* 91 F.3d at 1139 that instances of 'dumping' or im-proper screening of patients for discriminatory reason, or failure to screen at all, or screening a patient differently from other patients perceived to have the same condition, all are actionable under EMTALA. But instances of negligence in the screening or diagnostic process, or of mere faulty screening, are not. *Id.* However, if an examination is so cursory that it is not "designed to identify acute and severe symptoms that alert the physician to the need for immediate medical attention to prevent serious bodily injury," EMTALA is violated. *Eberhardt v. City of Los Angeles,* 62 F.3d 1253, 1257 (9th Cir.1995).

JCH stated, that although they fully support Dr. Ahler's judgment, if Dr. Ahler was wrong in his treatment or diagnosis, it was simply that Dr. Ahler failed to appreciate the seriousness of Jacob's condition. If that is the case, this matter is properly left for determination in the state law medical malpractice action that the Magruders have filed before the Indiana Department of Insurance.

The Magruders, however claim that they do not allege that Jacob's screening was faulty. Rather, they argue that JCH's examination of Jacob was not reasonably calculated to determine the presence of an emergency medical condition, that JCH failed to comply with its own policies, and that Jacob's examination was different from other examinations of patients with similar conditions. The Magruders claim that JCH's five-minute examination was so lacking in justification that it could not have identified or alerted Dr. Ahler of the need for immediate medical attention.

### a. Reasonably Calculated

■ The Magruders allege that since there is no JCH protocol on how patients entering with swollen and tender testicles are to be treated, the screening must be detailed enough to determine whether an

emergency medical condition exists. They allege that the five-minute examination performed by Dr. Ahler was not sufficient to make such a determination. They also argue that JCH does not have a policy for assessing the level of pain which is an important part to EMTALA, and therefore without a policy for the measurement of pain, that JCH cannot comply with EMTALA's requirements to provide an appropriate medical screening. Simply put, the Magruders claim that the examination provided to Jacob was not reasonably calculated to identify his critical medical condition because there was no assessment of the affected groin area and there was no assessment of his pain.

However, JCH argues that EMTALA does not establish a national standard of care for emergency departments with respect to its policies and procedures or courses of treatment. *Bryant*, 289 F.3d at 1162. Rather, EMTALA directs that the policies and procedures be reasonably calculated within the Hospital's capabilities to detect the presence of an emergency medical condition and that those policies be applied evenhandedly. *Eberhardt*, 62 F.3d at 1253. JCH contends that Dr. Ahler examined Jacob and diagnosed his condition as a left inguinal hernia which he attempted to manually reduce. Based upon the examination, Dr. Ahler, in his judgment, concluded that Jacob could be safely discharged home and be seen at JCH the following day by a urologist.

The Magruders' assertions are correct in that JCH has not adopted specific policies and procedures for measuring pain or that specify the care of patients with groin pain. However, based on the fact that EMTALA does not prescribe a set standard of policies or procedures to follow, leads to the conclusion that absent a showing otherwise, Dr. Ahler's examination of Jacob's groin and assessment of his pain during his screening was appropriate and reasonably calculated within the capabilities of JCH.

■ As previously discussed, Dr. Ahler testified that he assessed the groin area as well as pain before making his determination. There is no evidence to refute or criticize the scope or extent of JCH's policies and procedures relating to EMTALA. Generally, expert testimony is necessary in order to establish policy violations of EMTALA. *del Carmen Guadalupe v. Negron Agosto*, 299 F.3d 15 (1st Cir.2002). However, no such testimony is before the Court on this issue.

### b. Compliance With Policies

■ The Magruders also contend that JCH violated its own policy for screening children under the age of two due to the fact that neither Ms. Murphy nor Nurse Querry removed Jacob's diaper to weigh him. The Magruders state this is important, not due to the fact that Jacob was never weighed, but because neither Ms. Murphy nor Nurse Querry could have assessed the affected area without removing Jacob's diaper. And that failure to weigh Jacob is a substantial deviation from the standard screening process because it goes to the heart of an appropriate screening for a patient in a diaper with complaints of an affected groin area.

JCH concedes that the nursing staff did not weigh Jacob Magruder during his visit on May 8, 2001. However, they claim that such deviation was at best a de minimis deviation from hospital policy and had no impact on the medical screening of Jacob Magruder. In addressing deviations from Hospital policy, *Repp v. Anadarko Municipal Hospital*, 43 F.3d 519 (10th Cir.1994), held that de minimis deviations are not sufficient to establish a violation of the EMTALA statute.

The Magruders claim that because Jacob's diaper was not removed that no as-

sessment of the groin area was performed. However, Dr. Ahler testified that during the examination he fully assessed Jacob's groin area and also fully assessed the child's level of pain. Dr. Ahler even testified to manually trying to reduce the hernia. He also noted that the child was not in severe ischemic pain; he noted that he was fretful, but not in pain. While the Magruders are correct in their assertion that a full assessment was not performed by Ms. Murphy or Nurse Querry, such was performed by Dr. Ahler, who was unquestionably a part of the screening. The only deviation from hospital policy made by JCH in the screening of Jacob Magruder was not weighing him without his diaper, which reasonably only constitutes a de minimis deviation and does not amount to a violation under EMTALA.

### c. Uniformly Applied

Another issue in determining whether a hospital has complied with the EMTALA screening requirement is whether the hospital provided the patient with an examination comparable to that offered to other patients presenting similar symptoms. To survive summary judgment the Magruders must show that JCH deviated from its standard screening procedure. A hospital satisfies the requirements of § 1395dd(a) if its standard screening process is applied uniformly to all patients in similar medical circumstances. *Gatewood*, 933 F.2d at 1041.

According to the affidavit testimony of Debra Ellis, R.N., Vice President of Nursing at JCH, the medical screening provided to Jacob Magruder on May 8, 2001, comported with the established Hospital policies and procedures and was comparable to that offered to similar patients. Dr. Ahler also testified that his medical examination of Jacob Magruder was, in his judgment, sufficient to inform him as to the child's medical condition and was the same type of physical examination and medical

treatment that he would provide to any other similar patient with similar complaints or symptoms. Therefore, JCH contends that based on this testimony, Jacob Magruder received an appropriate medical screening as required under EMTALA.

The Magruders argue, however, that the assertions made by Ms. Ellis and Dr. Ahler are unsupported assertions that are insufficient to support a motion for summary judgment. The Magruders contend that neither affidavit identifies other patients with similar symptoms, or details of the medical screening afforded to those patients. The Magruders also reference four particular instances which allegedly demonstrate that Jacob was treated differently than similar patients presenting with similar conditions. Another argument asserted by the Magruders that Jacob was not treated similarly to those with similar conditions is that his condition was labeled as "Non-urgent" with a diagnosis of "swelling," while other patients presenting to the emergency department at JCH with a diagnosis of "swelling" were labeled as "Urgent." They claim that from 2000 to 2001 there were 25 such cases and therefore, this is a disparity in treatment.

JCH argues however, that neither the hospital staff nor Dr. Ahler had any duty to compare Jacob Magruder's medical screening to that offered to other patients in order to establish a basis for summary judgment. Rather, they argue that such duty was incumbent on the plaintiffs since case law holds that the burden of establishing a disparate medical screening is on the patient, not upon the hospital. *Marshall v. East Carroll Parish Hospital*, 134 F.3d 319 (5th Cir.1998).

JCH also argues that there is no evidence that the four patients referenced to by the Magruders were similar patients presenting with similar conditions. JCH

contends that of the four patients referenced to by the Magruders only two were infants, both of whom presented with complaints and symptoms completely different from Jacob Magruder. One presented with complaints of gagging while the other presented with complaints of headache, vomiting, and fever. JCH therefore asserts that the Magruders' argument that Jacob was treated differently than similar patients with similar conditions based on their examples of four particular patients is without merit.

Similarly, JCH contends that the information contained in the log is insufficient to establish that any patient presented with a condition similar to Jacob Magruder. The logs do not indicate specific complaints or specific body parts or organs. Also, not every patient that presented to JCH with "swelling" was labeled as "Urgent." The Magruders claim that from 2000 to 2001, 25 patients that presented with "swelling" were labeled as "Urgent," however, JCH argues that there is also evidence of patients presenting with complaints of "swelling" that were labeled as "Non-urgent." JCH claims that the logs are not a sufficient way to establish a comparison of Jacob's screening to that of other similar patients with similar conditions due to the fact that they do not contain enough specific information for such comparisons to be based.

Based on the forgoing, there is not sufficient evidence to support the Magruders' contention that JCH deviated from its standard screening procedure in regards to Jacob Magruder. It has not been established that JCH applied its standard screening process differently to Jacob Magruder than to other similar patients with similar conditions.

### 2. "Stabilization Requirement"

 An alternative theory for recovery is that JCH violated EMTALA in failing to stabilize Jacob's emergency medical condition. As previously discussed, a hospital's duty to stabilize does not arise until the hospital first detects an emergency medical condition. *Eberhardt*, 62 F.3d at 1259. This actual detection rule comports with the law of five other circuits, which requires a showing of actual knowledge of the emergency medical condition by the hospital as a condition precedent to the stabilization requirement. *See Summers*, 91 F.3d at 1140.

JCH argues that Dr. Ahler's testimony reveals that he conscientiously considered Jacob Magruder's condition and ruled out the need for emergency surgery. And therefore, JCH claims that under the actual detection rule, JCH's duty to stabilize never arose since he was never diagnosed as having an emergency medical condition. JCH claims that the medical screening afforded to Jacob Magruder was sufficient to identify acute and severe symptoms that would alert Dr. Ahler of the need for immediate medical attention.

The Magruders argue however, that JCH had knowledge of Jacob's emergency medical condition because Dr. Ahler diagnosed him with a left inguinal hernia and the need for surgery. JCH is capable of performing surgeries from 5 p.m. to 6 a.m. by virtue of an on-call policy of the surgical staff. However, instead of calling the surgery staff in, Dr. Ahler discharged Jacob with instructions to return for surgery the following day. The Magruders contend that JCH did not stabilize Jacob's condition by providing him with the surgery needed, even though such surgery could have been provided. Based on Dr. Ahler's testimony it is clear that he never diagnosed Jacob Magruder with an emergency medical condition which would trigger the stabilization requirements of EMTALA.

As stated, EMTALA does not establish a national standard of care for screening patients in the emergency department. In this case, Dr. Ahler testified that during the medical screening, he examined Jacob Magruder and assessed his groin area as well as his level of pain. Dr. Ahler then made the determination that Jacob Magruder's condition was not an emergency medical condition. There is simply no evidence that JCH failed to perform an appropriate and adequate medical screening. Furthermore, it has not been established that the screening provided to Jacob Magruder was applied differently to Jacob than to similar patients with similar conditions. Whether Dr. Ahler was correct in his diagnosis may be appropriate in the context of medical malpractice but is not relevant for purposes of EMTALA. It was clearly not the intent of Congress to create a broad prong new national species of medical malpractice which would supersede the state law remedies in that regard. In this case there is no showing that the essential values embedded in EMTALA have been violated here. Those values are important but the requirements of this federal statute are limited and narrow.

## IV. CONCLUSION

The Defendant, Jasper County Hospital, was in compliance with the requirements imposed by the Emergency Medical Treatment and Active Labor Act. Therefore, the Defendant's motion for summary judgment is hereby **GRANTED.** Each party will bear its own costs. The clerk shall enter judgment in favor of this Defendant and against these Plaintiffs.

**IT IS SO ORDERED.**